[Crim. No. 5574. Third Dist. Oct. 13, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
JIMMY DOWELL WILLIAMS, Defendant and Appellant.

**COUNSEL**

Richard F. Nickerson, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edward W. Bergtholdt and O. Robert Simons, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**REGAN, J.**—After a trial by jury, defendant was convicted of a violation of section 211a of the Penal Code (armed robbery). He appeals from the judgment of conviction.

On February 23, 1969, at 7:42 p.m., Dennis Strassburg, a patrolman for the Sacramento City Police Department, received a call of an armed robbery that had just occurred at a Speedee Mart at the corner of Amherst and Meadowview Road in Sacramento. At that time the patrol car in which he was traveling was proceeding south on 24th Street near the 24th Street bypass. Enroute to the scene the patrol car turned west on Meadowview, and while rounding the corner Strassburg noticed a two-tone green station wagon containing two white male occupants. Upon arriving at the scene, Strassburg was told that a two-tone green station wagon (Chrysler product and possibly a Plymouth) might have been involved in the robbery. Strassburg then put out a call over the air describing this vehicle as being possibly involved in the robbery.

Mrs. Zigrid Lee, owner of the market, arrived at the store shortly after the robbery. She determined the loss from the robbery to be $247. There were two cash registers in the store and prior to the robbery each had "bait money" in the $10, $5 and $1 slots. The "bait money" consisted of six one-dollar bills placed on the bottom of each bill slot. These six bills were stamped on the front and back with the store number and district number. The serial numbers were recorded and kept in a check file box. Mrs. Lee had last checked the registers on the night prior to the robbery, February 22, and noticed that all of the "bait bills" were present in each and every drawer. After the robbery all "bait bills" were gone. Mrs. Lee identified People's Exhibit No. 5 as one of the stolen "bait bills."

Steve Brassy was the clerk on duty when the robbery occurred at approximately 7:35 p.m. When Brassy opened the store on February 23 he noted that there was a "bait bill" in each of the money slots. These bills were never taken from the slots and Brassy never made change from the "bait bills" which were in the register.

On the night of the robbery Brassy came out of the back room to be confronted by a man who stuck a revolver in his face and said, "This is a holdup." He was told not to make any sudden motions. He was also told to go to the front of the store, get the money out of the register, act calmly, and not to say anything or he would be killed. Brassy gave the robber all the bills in the registers, including the "bait bills." He was then told to lie on the floor for two minutes, which he did. He described the robber as about his height of 6'1" and his weight as about 175 or 180 pounds. Brassy did not get a good look at the robber's facial features since he was wearing a nylon stocking over his face.

Approximately an hour and a half after the robbery, Brassy attended a lineup at the Sacramento city jail. Each man in the lineup was required to step up to a microphone and speak. When Brassy heard the voice of

codefendant, Russell Rose, he immediately identified him as one of the robbers. He testified, "As soon as he opened his mouth I knew it was him" and "It just stuck in my mind." Prior to hearing anyone in the lineup speak, and apparently based on physical size, Brassy tentatively picked out another man, but as soon as he spoke, Brassy knew that man was not the robber.

Murlene Elliott was a passenger in a car pulling into the Speedee Mart parking lot on the evening of February 23, 1969, just in time to see two men run from the store. There was a car parked across from the store with its lights on and motor running. As the men ran from the store they headed in the direction of that car. Immediately thereafter she noticed the car was gone. The vehicle was a 1960 or 1961 light and dark green Plymouth or Dodge which looked similar to the photograph of a station wagon portrayed in People's Exhibit No. 4. A few days after the robbery she was taken to view an impounded car; she stated that it "looked just like the car" that she had seen on the night of the robbery.

On February 23, at approximately 7:45 p.m., California Highway Patrolman Patrick O'Hare heard a radio broadcast describing a Chrysler or Plymouth station wagon which may have been involved in a robbery. A few minutes thereafter, he observed the vehicle at approximately 40th Avenue and 24th Street proceeding in a northerly direction. He undertook observation and pursuit of the car, but after a series of turns he lost it. He made a radio broadcast advising his loss of the vehicle and his location. A few minutes later he heard another unit had stopped the car at Franklin and 12th Avenue. He proceeded to the area and there interviewed the defendant.

George Olinares, a California highway patrolman, had also received information over the radio as to the robbery and a description of the suspected vehicle. He first observed this vehicle at 24th Street around the Stadium Club and proceeded to follow it. At 8 p.m., about 25 minutes after the robbery, the vehicle was stopped by another unit backing up Officer Olinares. There were two people in the vehicle who were identified as defendant and the codefendant Rose. Defendant was the driver of the vehicle.

On the evening of February 23, a detective sergeant for the Sacramento Police Department was dispatched to the Speedee Mart where he received the serial numbers of the "bait bills" from Mrs. Lee. At approximately 8:30 that evening he talked to defendant in the police station and asked him if he had any one-dollar bills. Without commenting, defendant reached into his pocket, took out a wallet, removed some ones and handed them over to the sergeant. One of the dollar bills from that wallet was identified as People's Exhibit No. 5. The detective sergeant identified

People's Exhibit No. 5 as one of the one-dollar bills whose serial number matched that on the list supplied by Mrs. Lee. The bill also had a black stamp mark on the front and back of the bill.

Defendant's wallet contained a total of $70. As to both codefendants, only one marked bill was found. The codefendant Rose had $7 in his pocket. A search of the impounded vehicle revealed no money nor a gun.

The defendant admitted that he had previously been convicted of grand theft, a felony.

The defendant took the stand in his own defense and denied having robbed the Speedee Mart store in question. He accounted for the money he had on his person when arrested as being the result of a paycheck from Campbell Soup and a personal check from one Ray Jones, both of which checks had been cashed prior to the robbery.

The defense then attempted to call John Chapman, but after discussion outside the presence of the jury, the court refused to allow Chapman to testify.

Counsel for defendant also took the stand and testified that on an occasion prior to trial he had talked with another prosecutor who informed him (the public defender) that Mrs. Lee had placed the "bait bills" in the register a week prior to the robbery and hadn't checked them. This other prosecutor recalled no such statement.

### 1. *Sufficiency of the Evidence.*

The defendant contends that the evidence is circumstantial only, has questionable probative value, and thus does not support the verdict.

On appeal we must view the evidence in the light most favorable to the verdict. (*People* v. *Newland* (1940) 15 Cal.2d 678, 681 [104 P.2d 778]; *People* v. *Myles* (1961) 189 Cal.App.2d 42, 45 [10 Cal.Rptr. 733].) "The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact; it is not whether guilt is established beyond a reasonable doubt. [Citation.]" (*People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].) "A judgment will not be reversed unless upon no reasonable hypothesis whatsoever is there sufficient evidence to support the trier of fact's conclusion, and an appellate court will assume the existence of every fact in support of the judgment that can reasonably be deduced from the evidence." (*People* v. *Bard* (1968) 70 Cal.2d 3, 4-5 [73 Cal.Rptr. 547, 447 P.2d 939].) The conflicting evidence presented by the defense merely presents a question of fact to be resolved by the jury (*People* v. *Brashier* (1969) 271 Cal.

App.2d 298, 306 [76 Cal.Rptr. 581]), and a reviewing court will not alter, or hold unsupported, a jury's findings merely because it might reasonably draw an inference different from the one the jury drew. (*People* v. *Robillard* (1960) 55 Cal.2d 88, 93 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086]; *People* v. *Kerr* (1951) 37 Cal.2d 11, 15 [229 P.2d 777].)

It is true that the evidence relied upon by the prosecution was circumstantial in nature. ■ However, guilty participation may be shown by circumstantial evidence as well as by direct evidence. (*People* v. *Jordan* (1962) 204 Cal.App.2d 782, 788 [22 Cal.Rptr. 731].)

The robbery here occurred at 7:35 p.m. A customer saw two men fleeing toward a car which she described as a 1960 or 1961 light green and dark green Plymouth or Dodge. Thereafter this vehicle was observed by various police officers in the vicinity until it was stopped at 8 p.m. Defendant was the driver of the car. Defendant had a "bait bill" in his possession at the time of the arrest. The "bait bills" were in place on the evening before the robbery. The "bait bills" were also in place when the store was opened on February 23. Rose, the codefendant, was positively identified by his voice as being one of the robbers.

■ The foregoing factors constitute a strong chain of circumstantial evidence sufficient to prove defendant's guilt.

### 2. Lineup.

■ In his argument on the sufficiency of the evidence, defendant also contends that his companion and codefendant, Rose, were subjected to an unfair lineup since only two of the five in the lineup were over 6 feet tall (including Rose), and Rose was wearing a zipped-up uniform over his clothes.

■ This matter was properly raised at the trial and testimony was then heard outside the presence of the jury. At the conclusion of the *voir dire*, the trial court made a finding that the lineup was not unfair and thus admissible. This was a proper procedure in determining fairness. (See *People* v. *Floyd* (1970) 1 Cal.3d 694, 712 [83 Cal.Rptr. 608, 464 P.2d 64]; see also *People* v. *Martin* (1970) 2 Cal.3d 822, 834 [87 Cal.Rptr. 709, 471 P.2d 29].)

■ Initially, we find the test as to whether the lineup "resulted in such unfairness that it infringed his [defendant's] right to due process of law" (*Stovall* v. *Denno* (1967) 388 U.S. 293 [18 L.Ed.2d 1199, 1205, 87 S.Ct. 1967]; *People* v. *Caruso* (1968) 68 Cal.2d 183 [65 Cal.Rptr. 336, 436 P.2d 336]) to be inapplicable. There was no problem here as to whether the lineup was "unnecessarily suggestive and conducive to

irreparable mistaken identification" within the meaning of *Stovall, supra,* at page 1206. It is clear from the record that Brassy was unable to identify Rose by his facial features, his clothes or any *visual* observation of this co-defendant and therefore the difference in height and clothing of the men in the lineup was irrelevant. The fact that Brassy originally picked out a person based on body size is also irrelevant, for as soon as that man talked, Brassy knew it was *not* one of the robbers. Finally, Brassy made his positive identification of Rose *by voice,* which is a recognizable means of identification. (See *People* v. *Ellis* (1966) 65 Cal.2d 529, 533-534 [55 Cal.Rptr. 385, 421 P.2d 393]; see also *People* v. *Osuna* (1969) 70 Cal.2d 759, 764-765 [76 Cal.Rptr. 462, 452 P.2d 678].) Under all the circumstances, we find no unfairness.

### 3. *Court's Refusal to Grant Immunity to Witness Chapman.*

█ Defendant contends he was denied due process of law in violation of the Fourteenth Amendment in that the court refused to grant witness Chapman immunity under the provisions of section 1324 of the Penal Code.[1]

John Chapman was called as a witness by counsel for defendant, who advised the court he had reason to believe from conversation with Chapman that it was Chapman, rather than defendant, who committed the armed robbery here in question. When called to the stand, Chapman, on the advice of counsel, refused to testify based upon his privilege against self-incrimination as guaranteed by the Fifth Amendment. At the time, Chapman was under the control of the Youth Authority and apparently had admitted to committing three other robberies. Defense counsel then

---

[1]This section as it read at the time of trial provides as follows: "1324. In any felony proceeding or in any investigation or proceeding before a grand jury for any felony offense if a person refuses to answer a question or produce evidence of any other kind on the ground that he may be incriminated thereby, and if the district attorney of the county in writing requests the superior court in and for that county to order that person to answer the question or produce the evidence, a judge of the superior court shall set a time for hearing and order the person to appear before the court and show cause, if any, why the question should not be answered or the evidence produced, and the court shall order the question answered or the evidence produced unless it finds that to do so would be clearly contrary to the public interest, or could subject the witness to a criminal prosecution in another jurisdiction, and that person shall comply with the order. After complying, and if, but for this section, he would have been privileged to withhold the answer given or the evidence produced by him, that person shall not be prosecuted or subjected to a penalty or forfeiture for or on account of any fact or act concerning which, in accordance with the order, he was required to answer or produce evidence. But he may nevertheless be prosecuted or subjected to penalty or forfeiture for any perjury, false swearing or contempt committed in answering, or failing to answer, or in producing, or failing to produce, evidence in accordance with the order."

requested that Chapman be granted immunity. The court denied this motion.

This assignment of error has no merit. One of the main purposes of the immunity statutes is to make it possible to reach the leaders of criminal conspiracies by guaranteeing immunity and thereby obtaining the testimony of their underlings and minor helpers. (*People* v. *Northrup* (1962) 203 Cal.App.2d 470, 475 [21 Cal.Rptr. 448]; see *People* v. *Clemons* (1960) 182 Cal.App.2d 808, 818 [6 Cal.Rptr. 727]; cf. *People* v. *Fowler* (1953) 119 Cal.App.2d 657, 664 [260 P.2d 89].) And in *People* v. *Stewart* (1969) 1 Cal.App.3d 339, 343 [81 Cal.Rptr. 562], the court states: "The main purpose of the enactment of Penal Code section 1324 seems to have been to enable the People to secure testimony and other evidence from persons implicated in criminal activities. When self-incriminating evidence is extracted under the mandatory compulsions of that code section such a person cannot then be prosecuted for the offense concerning which he gave evidence against himself. (See *People* v. *Richman,* 28 Cal.App. 761, 764 [155 P. 142].) The statute also makes it possible to reach leaders of criminal transactions by guarantying immunity to individuals who are often only underlings or minor participants. (See *People* v. *Northrup,* 203 Cal. App.2d 470, 475 [21 Cal.Rptr. 448].)"

Defendant cites *People* v. *Bernal* (1967) 254 Cal.App.2d 283 [62 Cal. Rptr. 96], in support of his contention that he was denied due process of law when the court refused to grant Chapman immunity under section 1324 of the Penal Code. In *Bernal,* however, the court specifically declined to rule on the issue of whether the defense could utilize section 1324; it merely commented that it could find no authority that section 1324 may be applied only to potential prosecution witnesses. (*Id.* at p. 295.) We find no error. "It has been repeatedly held that California's immunity statute is constitutional, and that, absent a policy of unfair and unequal law enforcement (which does not appear here), the prosecution may select the codefendant or coconspirator to whom immunity shall be given. [Citations.]" (*People* v. *Boehm* (1969) 270 Cal.App.2d 13, 20-21 [75 Cal. Rptr. 590]; see also Witkin, Cal. Criminal Procedure (1963) Witnesses, § 174, p. 165.)

The judgment is affirmed.

Pierce, P. J., and Bray, J.,* concurred.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.