SANDERS, Plaintiff in error, v. STATE, Defendant in error.

*No. State 56.   Argued April 8, 1975.—Decided June 30, 1975.*
(Also reported in 230 N. W. 2d 845.)

For the plaintiff in error there was a brief by *Howard B. Eisenberg,* state public defender, and *Alvin E. Whitaker,* assistant state public defender, and oral argument by *Mr. Whitaker.*

For the defendant in error the cause was argued by *Michael R. Klos,* assistant attorney general, with whom on the brief was *Victor A. Miller,* attorney general.

DAY, J. Plaintiff in error, through his counsel, by writs of error raises several issues as grounds for reversal; these will be discussed in the opinion.

Ben Sanders, Jr., plaintiff in error (hereinafter "defendant"), was convicted on two counts of first-degree

murder, having been found guilty of the murder of two police officers, Gerald Hempe and Charles Smith, of the Milwaukee city police department. The defendant brings three writs of error to review the judgment of conviction and the orders denying the postconviction motions argued by the state public defender and also those submitted by the defendant pro se.

At about 3:20 a.m. on February 1, 1973, the defendant was arrested and charged with two first-degree murders for the deaths of the two officers at approximately 10 p.m. on January 31, 1973. On June 12, 1973, a jury returned a verdict finding the defendant guilty of both charges.

Testimony at the trial revealed that on the evening of January 31, 1973, defendant was with several other people at a neighborhood organization headquarters. One of the persons there, Tyrone Daniels, became ill and the decision was made to take him home. The defendant took his car and drove Tyrone Daniels, Mozel Parrott and Walter Lemon to the Daniels residence at 2323 North Palmer Street in the city of Milwaukee, arriving and entering the house at about 9:45 p.m. Soon thereafter some other people from the same headquarters decided to go to the Daniels house. Loretta James, Larry Howard, Gregory "Rickey" Daniels (Tyrone Daniels' brother) and Tujuana McKee (a half-sister of the Daniels brothers, who also resided at 2323 North Palmer Street) left in Tyrone Daniels' car. As these people neared the Daniels home Officers Hempe and Smith, who were on patrol in the area, made a U-turn and followed them. The officers turned on their flashing red light as the Daniels car stopped at about 2310 North Palmer Street, across the street and just a few houses down from the Daniels home. The officers said they believed the vehicle was stolen and ordered the occupants to get out of the car. Rickey Daniels then began to argue with the officers

and told the girls, Loretta James and Tujuana McKee, to go into the Daniels house. Miss James testified that as she was walking in the door the defendant came out of the house. Miss James went into the house, into a rear bedroom, and was coming back toward the front door when she heard some shots. She ran to the door, looked out through the window in the door, and saw a person whom she believed to be the defendant shooting down the two officers as they were scuffling with Rickey Daniels. This account of the incident was corroborated by a fourteen-year-old girl, Debra Bridges, who was in her bedroom in a house next to the Daniels residence and observed that much from her window facing Palmer Street. She testified she saw the officers fall, saw some sparks from the gun and heard six rapid shots, but she was unable, from her vantage point, to see who was firing the shots. After the officers fell to the ground, she saw Rickey Daniels get up and run away and say to two or three other persons who had observed the scene, presumably including the one who fired the shots, that he would see them later.

A passing motorist also observed the shootings and testified at trial; he was Mr. Bobby Smith, who was driving down Palmer Street and noticed a struggle between two police officers and another man as he passed adjacent to the police vehicle. He stopped his car nearby and looked back to see a small black man (Rickey Daniels was black, five feet four inches tall) struggling with two police officers. Three to five other people came from across the street and were watching as the officers were bending over Daniels at about 90-degree angles, trying to subdue him; they were struggling about three to five feet to the rear of the police vehicle, the rear door of which was ajar. Someone in the group of people then said, "He has a gun." One officer reached for his gun, lifted it slightly but not entirely out of the holster, and

then dropped it back into the holster and continued to struggle with the man on the ground. Then Mr. Smith heard some shooting—six to eight shots fired rapidly; he ducked down in his car seat and when he looked up he saw the officers lying on the ground and a black man walking away who was of the same stature and build as the defendant. He could not identify that person's face. He also said that after the officers were shot, it seemed like he heard someone say words to the effect that they had been warned about bothering him.

One of the occupants of defendant's automobile, which brought Tyrone Daniels home, also observed the shooting. Mr. Walter Lemon said he was in the Daniels house when another Daniels brother came running in, saying the police were beating up Rickey. Mr. Lemon then went out onto the Daniels porch, saw the officers wrestling with Rickey, went back into the house very briefly and returned to the porch to see a man walk from midway in the street to where the officers were wrestling with Rickey and then shoot the police down. He identified the person firing those shots as the defendant. He said that after the shooting, the defendant ran down the street, but within about twelve minutes he saw the defendant in the Daniels house.

Loretta James testified that after she saw the shootings, she ran back into a bedroom in the Daniels house and when she came out she saw the defendant and Rickey and Tyrone Daniels in the house. The defendant was removing his brown leather coat and putting it on a pile of clothes in the Daniels dining room. She testified that when she saw Rickey Daniels in the house he had one handcuff on; he then ran out the back door of the house. She also said that she was talking with the defendant in the Daniels house at about 11 to 11:30 o'clock that night while police were there and he told her that

the gun was in the rear hallway. At about 1 a.m. he told her one of the officers was shot in the head.

Detective Vogl and his partner Officer Haase of the Milwaukee police department were the first officers to arrive at the scene soon after 10 p.m. on January 31, 1973. They found the two officers' bodies lying near the rear doors of the police vehicle, one of which was ajar. Detective Vogl ordered the area cordoned off and checked the two officers' service revolvers and found both of them fully loaded. Officer Hempe also carried a .25-caliber pistol which was also fully loaded. When the bodies were at the hospital, a check was made and it was found that both officers' bullet pouches contained their full ration of bullets; they had not fired their guns that evening. After the ambulances had left with the officers' bodies, another officer brought Rickey Daniels to the scene and he was still wearing Officer Hempe's handcuffs attached to one wrist. Rickey Daniels was ordered taken to the station for questioning. Detective Vogl examined the scene and found six spent shell casings very near the officers' bodies.

At about 3:15 a.m., February 1, 1973, when several officers went to the defendant's residence at 1926-A North Buffum Street, Milwaukee, to arrest him, they observed and seized a partially used box of .32-caliber bullets labeled W-W (Winchester Western) .32-auto. Later in the morning at about 7 o'clock, several officers armed with a warrant searched the Daniels home and seized a .32-caliber semiautomatic pistol, which was found between some clothes in the rear hallway; the gun had no fingerprints on it and was unloaded. They also seized a brown leather coat on which some bloodstains were noted; it was found on a pile of clothes in the dining room. At the trial Loretta James testified that a photograph taken by the police of where they found the coat was an accurate depiction of where she saw the defendant put it.

A firearms expert testified that the six spent casings found at the scene could have been fired from no other weapon than the .32-semiautomatic pistol found in the Daniels rear hallway; he also testified that the slugs found in Officer Smith's clothing and body and those found in Officer Hempe's body could have been fired from no other weapon. He also testified that the slugs and the casings were in all physical characteristics identical to the cartridges found in the box of cartridges seized at the defendant's residence from under the couch he slept on.

Another expert in examination of blood and other bodily fluids testified that the brown leather coat seized at the Daniels house did have human bloodstains on it, but too little to type. A shirt taken from the defendant at the time of his arrest was found by the expert to have human blood on it of type A; Officer Smith had type A blood, Officer Hempe type O blood, and the defendant had type O blood.

The officers were declared dead moments after arrival at the hospital and the acting medical examiner of Milwaukee county testified he examined the bodies and found that both officers died from gunshot wounds to the head; the wounds followed a downward course, indicating the shots were fired from above. He said the type of wounds which Officer Smith suffered might spurt blood but he could not say how far.

On February 2, 1973, the defendant appeared before the Hon. CHRIST T. SERAPHIM, Circuit Judge for Milwaukee county, and probable cause was found on the face of the complaint to hold him for further proceedings. On February 14th defendant appeared in the county court of Milwaukee county before the Hon. FREDERICK P. KESSLER and at that time waived his right to a preliminary examination. He was arraigned on March 14, 1973, stood mute, and a plea of not guilty was entered on his behalf by the court. A motion for a change of

venue, which was supported by the state, was granted and the place of trial was ordered changed from Milwaukee county to Brown county. After a hearing on and denial of defendant's motion to suppress certain evidence and after four days of *voir dire,* trial was held on June 4 to 8 and 11 to 12, 1973. The jury deliberated for an hour and a half and returned a verdict of guilty on both counts. Judgment of conviction was entered on June 12, 1973; the defendant was sentenced to life imprisonment on each count, the sentences to run consecutively.

At the trial the defendant had private counsel. To represent the defendant on his postconviction motions, the state public defender was appointed on July 9, 1973. The time for making, hearing and deciding such motions was extended to February 1, 1974, and on January 4, 1974, the office of the state public defender filed a motion for an order dismissing the information with prejudice or, in the alternative, for a new trial. The defendant filed supplemental pro se motions to the same effect. On February 1, 1974, the state public defender's postconviction motions were heard and denied, and on March 17th the other motions submitted by the defendant pro se were also denied.

Three writs of error to review the judgment of conviction and orders denying the postconviction motions argued by the state public defender and those submitted by the defendant were brought.

### Validity of arrest.

The first question is as to the validity of arrest. The defendant claims the trial court should have dismissed the information, alleging his arrest was invalid due to the absence of both probable cause and a warrant. Prior to trial the defendant made an oral motion to dismiss on these grounds and also moved to suppress the evidence

seized at the time of the arrest, which consisted of a box of cartridges, and that seized as a result of the search warrant for Palmer Street—the coat and the gun. These motions were denied.

The decision to arrest the defendant was made by Captain Will of the department, who was one of the captains in charge of the detective bureau and was that night assigned to coordinate all the information developed by way of police interviews and to relay such information to the officers on the street. He issued the order to arrest the defendant at about 3 a.m. on February 1, 1973. At the time the order was issued, Captain Will had four pieces of information on which he based probable cause to arrest; first, when he arrived at the station he was informed by other officers that Mr. Sanders' automobile was located at the scene of the crime; second, that Mr. Sanders had been very near the scene of the crime in the Daniels residence within fifteen to twenty minutes after the shootings; third, although he did not personally speak with her, he was informed by other officers that Tujuana McKee had told them she had seen the shootings, the shots had come from where Mr. Sanders was standing and she believed he had fired the gun; and fourth, he was informed by detectives that Rickey Daniels had told them that while he was struggling with the two officers on the ground he saw Mr. Sanders shoot them. Captain Will testified at the suppression hearing that he personally had heard part of Rickey Daniels' statement wherein Daniels identified Mr. Sanders as the one who fired the shots and that he decided within fifteen to twenty minutes to issue the order to arrest Mr. Sanders.

The defendant contends, and the state concedes, that the first two elements of this four-part set of facts upon which Captain Will based his decision to arrest would not support a finding of probable cause if the second

two elements, the statements by Tujuana McKee and Rickey Daniels, which the state relied on, were not sufficient to support a warrantless arrest. The defendant contends that there is insufficient evidence in the record to support the conclusion that Miss McKee told the police she saw Mr. Sanders shoot the officers and that the information given by Rickey Daniels was so unreliable within the context it was given that it should have been discounted by the police and, therefore, cannot form a basis of a conclusion of probable cause because that finding must rest on reasonably trustworthy information. *State v. Paszek* (1971), 50 Wis. 2d 619, 625, 184 N. W. 2d 836; *Draper v. United States* (1959), 358 U. S. 307, 313, 79 Sup. Ct. 329, 3 L. Ed. 2d 327.

Acting Detective Jordon testified at the suppression hearing that he and his partner went to 2323 North Palmer Street at about 11:30 p.m. on January 31st; that there were several other police officers there at the time and one of them informed him that Miss McKee had said she was present on the street when the shooting occurred. Officer Jordon questioned her there and she denied being on the street and said she was inside watching television. She made some kind of side comment to the effect, "Yes, I was there," so Officer Jordon brought her down to the detective bureau at about midnight or shortly thereafter. He testified that she told him and his partner that she had been on the street at the time, that she was standing watching her brother Rickey struggle with the two officers, that Loretta James was on her right and that Mr. Sanders was on her left; that she heard shots and saw streaks of fire go by her left side coming from where Mr. Sanders was standing. After taking this statement, Mr. Jordon went back to Palmer Street to try and locate Loretta James; failing to do so, he returned to Miss McKee at the police station and at about 2:30 in the morning she repeated the state-

ment; he then relayed this statement to Captain Will. However, at the suppression hearing, Miss McKee denied that she had observed the shootings or ever told the police she had. She recalled talking to Officer Jordon and his partner but insisted that she had told them that she had gotten out of the car, gone into the house, and was there watching television with her mother throughout the entire incident. First, she said she heard no gunshots while watching television and then she said she heard some shots and yelled, "Rickey's dead" or "Is Rickey dead?" or "What happened to Rickey?" She further testified that Mr. Sanders and Loretta James were inside with her all the time and that she just sat in front of the television watching a cowboy movie and crying.

This court has said that the credibility of witnesses testifying at a hearing outside of the presence of the jury, such as a suppression hearing, is a question to be resolved by the trial judge. *State v. Pires* (1972), 55 Wis. 2d 597, 602, 603, 201 N. W. 2d 153. The trial judge chose to believe Officer Jordon and we cannot say that the judge's finding on this point is contrary to the great weight and clear preponderance of the evidence, which is the standard it must meet to justify reversal on appeal. *Pires* at page 603; *State v. Williams* (1970), 47 Wis. 2d 242, 251, 177 N. W. 2d 611. It was certainly not unreasonable for Captain Will to believe the statements made to him by Officer Jordon.

At the same suppression hearing, Rickey Daniels testified that he was down on the ground struggling with the officers when the shooting occurred and he did not see who fired the gun. He admitted he told the police detectives that Mr. Sanders had done the shooting but denied that it was true. He said his reason for giving the story was that he had been repeatedly beaten by the police officers and "Things happened so fast that it

popped in my mind to call his name." The defendant argues that these circumstances did not justify reliance by the police on Daniels' statement.

At the suppression hearing it was further shown that when Daniels was arrested for murder soon after 10 p.m. on January 31st, when he was caught with one of the handcuffs still attached to his wrist, he was brought to the scene of the killings and gave a description of the man he said he saw shoot the officers. He described him as a black male six feet tall between thirty and forty years of age, wearing a black leather jacket. Within minutes after this description was broadcast, a report came in on the police radio of two persons matching it. Daniels was taken there and identified a person as the murderer; that person was then arrested for murder.

After this person was eliminated as a suspect by the police, Daniels was questioned further and said that another man had done the shooting; that man was brought to the station and Daniels identified him there as the person who killed the officers. The police again soon eliminated this man as a suspect and continued to question Daniels. Then Daniels retracted his identification of the latter person and said that Mr. Sanders had done the shooting. A detective testified that Daniels told him that he, Daniels, had not named Mr. Sanders sooner because he was a friend and belonged to the same neighborhood self-help organization that Daniels belonged to. After this statement was given to the detectives, they relayed it to Captain Will who had personally heard the most incriminating portion of Daniels' statement. All the police officers denied using any physical force on Rickey Daniels whatsoever.

When considered with the account given by Tujuana McKee and Daniels' own explanation as to why he had not said earlier that Mr. Sanders was the one who fired the shots, Daniels' testimony must be held to be reasonably trustworthy.

Probable cause to arrest was defined by this court in *State v. Paszek, supra,* at pages 624, 625, as follows:

"Probable cause to arrest refers to that quantum of evidence which would lead a reasonable police officer to believe that the defendant probably committed a crime. *Henry v. United States* (1959), 361 U. S. 98, 102, 80 Sup. Ct. 168, 4 L. Ed. 2d 134. It is not necessary that the evidence giving rise to such probable cause be sufficient to prove guilt beyond a reasonable doubt, nor must it be sufficient to prove that guilt is more probable than not. It is only necessary that the information lead a reasonable officer to believe that guilt is more than a possibility, *Browne v. State, supra,* and it is well established that the belief may be predicated in part upon hearsay information. *Draper v. United States* (1959), 358 U. S. 307, 79 Sup. Ct. 329, 3 L. Ed. 2d 327. The quantum of information which constitutes probable cause to arrest must be measured by the facts of the particular case. *Wong Sun v. United States* (1963), 371 U. S. 471, 83 Sup. Ct. 407, 9 L. Ed. 2d 441."

This court has also said that probable cause for an arrest is less than that required for a bindover at a preliminary hearing. *State v. Williams, supra,* page 248. We conclude that Captain Will's decision to order the arrest was supported by probable cause. We also find that the arrest was justified without a warrant because of the exigent circumstances that existed at the time; however, this court has held that where probable cause exists, arrest warrants are unnecessary even though no exigent circumstances exist. *Rinehart v. State* (1974), 63 Wis. 2d 760, 218 N. W. 2d 323; *State v. Estrada* (1974), 63 Wis. 2d 476, 217 N. W. 2d 359; *State v. Wallace* (1973), 59 Wis. 2d 66, 207 N. W. 2d 855.

*Seizure of evidence.*

The next question raised by the defendant is whether or not the evidence seized at the time of his arrest was properly admitted in evidence.

The defendant was arrested about 3 a.m. at the house where he lived when the police were let into the room by the woman who leased the house. There is a dispute as to where the box of cartridges was found; the defendant claims he hid them in the bed and that the police made a search in order to find them. The testimony of the officers was that the defendant was resting on a couch; that they noticed a box of cartridges on the floor and that while the particular officer said he noticed them right away, as he was patting down defendant's legs, he waited until the detectives arrived before seizing them. Another officer said he shone his flashlight around the room, but that he first noticed the box of cartridges on the floor under the edge of the couch without the aid of his flashlight when he was standing about four feet from the couch. He said he could not tell exactly what the box contained until he used his flashlight. His testimony was that the couch was opened only after the detectives arrived and that the bullets were not found when it was opened. Another officer also testified that the cartridges were on the floor.

Based on the testimony at the suppression hearing the court was justified in finding that the cartridges were properly seized as being in plain view.

"If the police have a prior justification to be present in a position to view an object in plain view and if their discovery of that object is inadvertent, then the object may be seized." *Day v. State* (1973), 61 Wis. 2d 236, 248, 212 N. W. 2d 489.

The use of a flashlight does not defeat the inadvertence requirement and render the plain-view doctrine inapplicable. *Anderson v. State* (1974), 66 Wis. 2d 233, 244, 223 N. W. 2d 879.

The cartridges were properly seized under the plain-view doctrine and properly admitted into evidence at the trial.

The defendant also challenges the seizure of the coat and gun at the Palmer Street address as being improper. A search warrant was issued at 6:20 a.m. on February 1, 1973, to search the Daniels residence on Palmer Street to find the pistol alleged to be the murder weapon. This warrant was issued after a brief hearing before the Hon. CHRIST T. SERAPHIM where only one witness testified, Detective Sincere. He said that in the course of the investigation of the shootings since 10 p.m. the previous evening he had communicated twice with an informant whom he had known and worked with for about a year and a half; during that time he had met with the informant once every week or two and the informant had always been accurate. He said he had personally checked much of the information supplied by this person and always found it to be true, that this person's information had led to over 25 convictions and that he considered him thoroughly accurate and reliable. This informant had said he had communicated with a black woman named Loretta, whose last name he believed to be James, and that she had told him that she was present when Mr. Sanders ran off the porch, shot two police officers, returned to the house, and placed the gun in the center of the table in the house. There was discussion about the gun being there and then another black woman removed the gun from the table, entered the rear hallway of the house, and returned without the gun. Loretta James was telling the informant what she actually had seen. He also advised the court that he himself had stood on the porch at the Palmer Street address and that the scene of the shootings was clearly visible from the spot. On the basis of this testimony, the warrant was issued, a search was conducted, and the pistol found in the rear hallway of 2323 North Palmer Street.

The defendant contends the warrant was improperly issued because the information it was based on failed to supply the issuing magistrate with sufficient proof of the reliability of the original source of information, to wit, Loretta James. It is not contended that the reliability of the unnamed informant was not sufficiently shown.

The principal case that defines the relevant criteria is *Aguilar v. Texas* (1964), 378 U. S. 108, 84 Sup. Ct. 1509, 12 L. Ed. 2d 723. In *State v. Paszek, supra,* at page 627, this court said:

> "Simply stated, the two-pronged test of *Aguilar* requires that the officer must establish: (1) The underlying circumstances from which he concludes that the informant is reliable; and (2) that the underlying circumstances or manner in which the informant obtained his information is reliable."

Hearsay information is proper to provide the basis for the finding of probable cause necessary for the issuance of a search warrant. Here there are two levels of hearsay involved and it is necessary that *Aguilar's* two-pronged test be applied to both levels to test the reliability of the declarants. Certainly, the unnamed informant met the test since Detective Sincere's description of his prior work with the informant satisfies the first prong and the second prong is satisfied by Detective Sincere's statement that he obtained his information through two communications with the informant in the approximately eight-hour period following the shootings. But the defendant contends that the information conveyed by Miss James to the informant has insufficient guarantees of reliability, that is, that it fails to satisfy the *Aguilar* test. The crucial distinction, however, is between the unnamed police informer and the ordinary named private citizen. This court said: "Essentially, the search for reliability in the case of a citizen informer is

shifted to the second prong of the *Aguilar* test, *i.e.*, from personal reliability to 'observational' reliability." *State v. Knudson* (1971), 51 Wis. 2d 270, 277, 187 N. W. 2d 321.

The element of observational reliability is the reliability of the circumstances underlying the means by which the person obtained the information. It has been held by this court on many occasions that this element has been satisfied when the means is said to be direct personal observation.

"The very fact of such direct, personal observation, rather than some mere hunch or inference from the circumstances, attests to the reliability of the manner in which [the private citizen] obtained his information." *Anderson v. State, supra,* at page 240. *See also: State ex rel. Cullen v. Ceci* (1970), 45 Wis. 2d 432, 446, 173 N. W. 2d 175.

And in *Anderson,* page 242, this court said:

"If a citizen-informer is relied on by the police and is an eyewitness to the facts he relates to the complainant, his reliability is sufficiently established."

In the instant case, Loretta James was a private citizen who said she personally observed the information she related to the unnamed informant. The *Aguilar* test may also be satisfied by means of independent corroboration of some of the details of the proffered information. *Spinelli v. United States* (1969), 393 U. S. 410, 89 Sup. Ct. 584, 21 L. Ed. 2d 637; *Leroux v. State* (1973), 58 Wis. 2d 671, 207 N. W. 2d 589; *State v. Paszek, supra.* Here, several details of Miss James' report were corroborated. Here, the unnamed police informant's reliability is not attacked. Considering the heightened degree of reliability attributed to Miss James due to her status as an ordinary named private citizen, the fact that she was reliably alleged to have first-hand knowledge and the police corroboration of some details, we conclude that the

information presented to the judge satisfied the test for reliability and justified the court's reliance on double hearsay as the basis for issuance of the search warrant. The items were properly seized under that warrant and were admissible.

*Change of venue.*

The defendant moved for a change of venue from Milwaukee county because of the amount of pretrial publicity. The defendant alleges, however, that it was an abuse of discretion for the judge to transfer the trial to Brown county because of the small percentage of black residents there. The defendant also argues that the provisions in the statute which do not permit a defendant to choose the county where he will be tried restricts his right to move for a change of venue because he risks the possibility of being tried in a county even more hostile.

Sec. 971.22 (3), Stats., requires that venue be changed to a county where an impartial trial can be had. This court has expressly recognized that if a fair trial cannot be had in the transferee county, another change of venue is required. *State v. Nutley* (1964), 24 Wis. 2d 527, 566, 129 N. W. 2d 155. The fact that there is a very small minority population in Brown county does not constitute nor create a denial of an impartial trial.

". . . a defendant may not, for example, challenge the makeup of a jury merely because no members of his race are on the jury, but must prove that his race has been systematically excluded." *Apodaca v. Oregon* (1972), 406 U. S. 404, 413, 92 Sup. Ct. 1628, 32 L. Ed. 2d 184.

The record shows plainly that the trial was moved to avoid pretrial publicity. Brown county was chosen because it was the fourth largest in the state and it was believed that a fair and impartial jury could be impaneled there. The defendant has not alleged that the jury which

tried him was actually biased due to its racial composition. The defendant did not move to change the venue from Brown county.

We conclude there was no abuse of discretion in the transfer of this trial to Brown county on the defendant's motion for a change of venue. We also conclude that the provisions in the statute providing that the court shall transfer the trial to a county where an impartial trial can be had does not deprive a defendant of the constitutional protection of a fair and impartial trial merely because the statute does not permit such defendant to name the county to which his trial shall be transferred.

*Request for immunity grant to a witness for defendant.*

Defendant claims that the Wisconsin statute allowing the court to grant immunity to a witness only upon motion of the state is unconstitutional (sec. 972.08, Stats.) ; the reason being that it provides no reciprocal right for immunity to be granted upon the motion of the defendant.

In this case the defendant wanted to have Tyrone Daniels granted immunity so that he would testify on behalf of the defendant. The district attorney objected on the quite reasonable ground that he was convinced Mr. Daniels would perjure himself. Mr. Daniels' statement read into the record did not indicate he would be such an unequivocally helpful witness for the defendant, and this was considered by the court in denying the defendant's motion. The matter of the right to have a witness granted immunity was discussed by this court in *Hebel v. State* (1973), 60 Wis. 2d 325, 331, 210 N. W. 2d 695:

"Traditionally, the granting of immunity has been for the benefit of the state and an accused cannot invoke the statutory provision to compel a witness to testify

in his behalf. 98 C. J. S., *Witnesses,* p. 262, sec. 439; 22 C. J. S., *Criminal Law,* pp. 160, 161, sec. 46 (2). *See Kastigar v. United States* (1972), 406 U. S. 441, 92 Sup. Ct. 1653, 32 L. Ed. 2d 212, in which the court reviewed the historical foundation of immunity statutes and discusses their purpose and constitutional validity. It has been held that immunity statutes which provide government with the power to compel the testimony of a witness but do not afford a correlative right to the accused are not a denial of equal protection of the laws. *See State v. McCown* (1973), 189 Neb. 495, 203 N. W. 2d 445. Likewise, such immunity statutes do not constitute a denial of due process and in the absence of a policy of unfair and unequal law enforcement, the prosecution may select a codefendant or a coconspirator to whom immunity shall be given. *See People v. Williams* (1970), 11 Cal. App. 3d 1156, 90 Cal. Rptr. 409. But this unfair and unequal law enforcement relates to those to whom immunity could be granted, not to one who collaterally seeks immunity for a prospective witness. If Hebel were correct in his argument he would have a right to immunize all participants to the crime in return for exculpatory evidence. The result of such a doctrine in some cases would be to free all the participants but one. We see no reasonable relationship between the immunity power of the prosecutor and his duty not to conceal exculpatory evidence."

We reaffirm our statement in *Hebel* and conclude there is no constitutional defect in sec. 972.08, Stats., nor was there error in the trial court's refusal to grant immunity to Daniels.

*District attorney's closing argument.*

The defendant claims that certain remarks of the prosecutor in his closing argument constituted prejudicial error requiring reversal. The remarks were objected to at the trial but at no time did the counsel for the defendant move for a mistrial based on these supposed incidents of prosecutorial misconduct. The requirement

is that there be an objection and an immediate motion for a mistrial.

"It is necessary to make immediate objection and to move for a mistrial if the issue is misconduct of counsel." *Sheldon v. Singer* (1973), 61 Wis. 2d 443, 450, 213 N. W. 2d 5. *Accord, Hansen v. State* (1974), 64 Wis. 2d 541, 552, 219 N. W. 2d 246.

Even if the court in its discretion decided to consider the remarks, it is clear from the record that they do not constitute misconduct.

### *Pretrial discovery motion.*

The defendant claims error because a defense motion to turn over prior to trial any and all written or phonographically recorded statements by any witness the state intended to call was denied. This motion was made pursuant to sec. 971.24 (1), Stats., which provides:

"971.24 **Statement of witnesses.** (1) At the trial before a witness other than the defendant testifies, written or phonographically recorded statements of the witness, if any, shall be given to the other party in the absence of the jury. For cause, the court may order the production of such statements prior to trial."

There is no claim that statements were not furnished to the defense prior to the testimony of the state's witnesses; there is no allegation of prejudice flowing from the denial of the motion and none could be shown. This statute, passed in 1969, codified pre-existing case law in an attempt to make it clear that prior statements must be turned over prior to the witness' testimony and not just prior to cross-examination.

"The right to a fishing expedition in the criminal-law field has not been recognized in Wisconsin . . . [citing] *State ex rel. Byrne v. Circuit Court* (1962), 16 Wis. 2d 197, 114 N. W. 2d 114. . . . [which] should be

distinguished from compulsory production of prior statements of a witness *during the trial* . . . ." (Emphasis added.) *Ramer v. State* (1968), 40 Wis. 2d 79, 87, 161 N. W. 2d 209.

It was not error to deny the motion for pretrial production of these statements.

## *Other issues.*

Among the alleged errors is the claim that the trial court committed error by refusing to dismiss the proceedings because the state had unknowingly relied upon perjured testimony. One of the witnesses for the state testified that he had seen the defendant shoot the officers. Later the district attorney's office determined that the witness was lying, that he had neither been at the scene nor seen the shooting. The district attorney informed the court of this and offered to join defense counsel in a motion for a mistrial. The record is clear that, based on the advice of counsel as shown by the statement made by the defense attorney in the record, the defendant intelligently and strategically decided to proceed and not ask for a mistrial. Defense counsel, however, insisted then that the state not be allowed to call any other witnesses; when this request was denied, the mistrial was reoffered and the defense refused.

The jury was thoroughly instructed to disregard the testimony of the witness. There was a clear waiver by the defense of any claim to relief here.

There is no merit in the contention that the trial court erred in refusing to grant defendant's motion to produce the defendant so that he could be present at his post-trial motions.

The statute, sec. 974.06 (5), provides that the court may entertain and determine such motion without requiring the production of the prisoner at the hearing.

"It can thus be concluded that the presence of the petitioner and an evidentiary hearing are not necessary unless (1) there is a substantial issue of fact, and (2) there is something to support the contention beyond the mere allegation. The additional support could come from the defendant himself, from trial counsel, from the record, or from the prosecutor. The determinations as to the necessity for ordering an evidentiary hearing on the motion and the necessity or desirability of the presence of the petitioner at such hearing are discretionary and will be upset only for an abuse of that discretion." Eisenberg, *Post-Conviction Remedies in the 1970's,* 56 Marq. L. Rev. (1972), 69, 82.

Here, the hearing dealt with issues of law; defense counsel had other opportunities to consult with the defendant. No substantial issues of fact were even alleged and no abuse of discretion occurred.

We find there was sufficient evidence for a jury, acting reasonably, to find the defendant guilty as charged beyond a reasonable doubt. *Bautista v. State* (1971), 53 Wis. 2d 218, 223, 191 N. W. 2d 725.

Finally, we find that there was no error in the court's sentencing the defendant to two consecutive life sentences. The reasons for doing so were explained and certainly did not constitute an abuse of discretion. *Gaddis v. State* (1974), 63 Wis. 2d 120, 129, 130, 216 N. W. 2d 527; *McCleary v. State* (1971), 49 Wis. 2d 263, 182 N. W. 2d 512; *State v. Dean* (1975), 67 Wis. 2d 513, 227 N. W. 2d 712.

We have examined the other alleged errors raised by the defendant and find them to be without merit.

*By the Court.*—Judgment affirmed.