JOHNSON, Plaintiff in error, v. STATE, Defendant in error.

*No. 75–350–CR. Submitted on briefs October 7, 1976.—*
*Decided January 18, 1977.*
(Also reported in 249 N. W. 2d 593.)

346

For the plaintiff in error the cause was submitted on the brief of *Howard B. Eisenberg,* state public defender, and *Alvin E. Whitaker,* assistant state public defender.

For the defendant in error the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Betty R. Brown,* assistant attorney general.

ABRAHAMSON, J. Defendant George H. Johnson, Jr., was charged with the first-degree murder of his wife, Cynthia Johnson, in a criminal complaint filed November 6, 1973, in the circuit court for Milwaukee county. The time of the alleged offense was November 4, 1973, between 3:15 and 5:00 p.m. A jury trial was had on October 9–12, 14–19, 1974, which resulted in the jury returning a verdict of guilty of first-degree murder after some twelve hours of deliberation. A judgment of conviction was entered on October 19, 1974, by which the defendant was sentenced to life imprisonment. Motions for post-conviction relief were denied by order entered July 23, 1975.

The defendant raises the following issues:

I. Did the trial court err in finding that probable cause was shown for defendant's arrest without a warrant?

II. Did the trial court err in finding that defendant's confessions were voluntarily made and therefore admissible at trial?

III. Did the trial court err in limiting the scope of cross-examination of one of the prosecution's witnesses as to his mental condition?

IV. Did the trial court err in refusing to declare a mistrial after discovery that certain documents from defendant's police file had been inadvertently sent into the jury room during the jury's deliberations?

V. Did the trial court err in refusing several instructions requested by the defense on its theory of the case?

VI. Was defendant denied a fair trial by certain remarks made by the prosecutor in his closing argument to the jury?

VII. Should the defendant be granted a new trial in the interest of justice?

## *I. ARREST*

Defendant claims that the police did not have probable cause to believe he committed the crime charged at the time of his arrest in the early hours of November 6, 1973.

■ ■ The circumstances in which an arrest without a warrant may be made are stated in sec. 968.07 (1) (d), Stats.:

"(1) A law enforcement officer may arrest a person when:
". . .
"(d) There are reasonable grounds to believe that the person is committing or has committed a crime."

"Reasonable grounds" and probable cause are synonymous, and have been defined by this court as follows:

"'The 'reasonable grounds' or what is more commonly referred to as probable cause, is not that quantum of evidence which might later support a conviction, rather it is '. . . that quantum of evidence which would lead a reasonable police officer to believe that the defendant probably committed a crime.'" *Ball v. State,* 57 Wis.2d 653, 659, 205 N.W.2d 353 (1973).

Probable cause is discussed at somewhat greater length in *State v. Paszek,* 50 Wis.2d 619, 624, 625, 184 N.W.2d 836 (1971):

"Probable cause to arrest refers to that quantum of evidence which would lead a reasonable police officer to believe that the defendant probably committed a crime. *Henry v. United States* (1959), 361 U.S. 98, 102, 80 Sup. Ct. 168, 4 L. Ed.2d 134. It is not necessary that the evidence giving rise to such probable cause be sufficient to prove guilt beyond a reasonable doubt, nor must it be sufficient to prove that guilt is more probable than not. It is only necessary that the information lead a reason-

able officer to believe that guilt is more than a possibility, *Browne v. State, supra,* and it is well established that the belief may be predicated in part upon hearsay information. *Draper v. United States* (1959), 358 U.S. 307, 79 Sup. Ct. 329, 3 L. Ed.2d 327. The quantum of information which constitutes probable cause to arrest must be measured by the facts of the particular case. *Wong Sun v. United States* (1963), 371 U.S. 471, 83 Sup. Ct. 407, 9 L. Ed.2d 441. Probable cause is defined in *Draper v. United States, supra,* p. 313, as:

" ' "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States, supra,* at 175 [(1949), 338 U.S. 160, 69 Sup. Ct. 1302, 93 L. Ed. 1879]. Probable cause exists where "the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed. *Carroll v. United States,* 267 U.S. 132, 162.' "

This standard is an accommodation of the individual's right to liberty and the public interest in effective prosecution and control of crime.[1]

It is not necessary that the individual officer actually

---

[1] "These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice." *Brinegar v. United States,* 338 U.S. 160, 176, 69 Sup. Ct. 1302, 93 L. Ed. 1879 (1949).

taking the suspect into custody personally have the requisite knowledge. The arresting officer may rely on the collective information in the police department. The police force is considered as a unit, and the inquiry is whether all the collective information in the police department is adequate to sustain the arrest. *State v. Mabra,* 61 Wis.2d 613, 625, 626, 213 N.W.2d 545 (1974); *Rinehart v. State,* 63 Wis.2d 760, 764, 765, 218 N.W.2d 323.

Here the police had the following information: A neighbor heard squeals or screams such as a frightened woman might make emanating from Cynthia Johnson's apartment around 3 or 4 p.m. on November 4th; a friend of Cynthia Johnson, one Robert Lee Williams, positively placed the defendant at Cynthia Johnson's door around 3 p.m. on that date; an acquaintance of the victim informed the police that the defendant was estranged from his wife and that his wife feared the defendant would harm her in some way; another friend of the victim informed the police that she had received an angry and threatening phone call from the defendant, relating to his wife, at about 5:45 p.m. on November 4th.

Before the police obtained all of the foregoing information—particularly, before Robert Lee Williams had identified the defendant as the man he saw at the victim's apartment—the defendant had gone to the police station to identify the body of the victim as that of his wife. At this time, when the defendant undisputedly was not in custody and was not suspected of the crime, he informed the police that he had not seen his wife on November 4th and had spent the day in church and in a tavern with a friend.

The facts and circumstances here were such that police officers of reasonable caution could have believed the defendant probably committed the crime. In our opinion the police had probable cause for the defendant's arrest.

Defendant also contends that under *Coolidge v. New*

*Hampshire,* 403 U.S. 443, 91 Sup. Ct. 2022, 29 L. Ed.2d 564 (1971), the arrest was invalid because under the circumstances, which he claims were "nonexigent," the police could have obtained a warrant for his arrest but failed to do so.

This same contention was rejected in *Rinehart v. State,* 63 Wis.2d 760, 766–768, 218 N.W.2d 323 (1974), in which this court adopted the rule and rationale of *United States v. Millen,* 338 Fed. Supp. 747 (E.D. Wis. 1972). *See also State v. Estrada,* 63 Wis.2d 476, 494, 217 N.W.2d 359 (1974) ; *Sanders v. State,* 69 Wis.2d 242, 255, 230 N.W.2d 845 (1975).[2]

■ The arresting officers went to the home of the defendant's parents. They knocked at the door. Defendant's father appeared, and the officers asked whether the defendant lived there. They did not enter forcibly, nor was any evidence seized while they were in the house. Defendant was suspected of first-degree murder, the most serious offense against another person defined by

[2] In *Gerstein v. Pugh,* 420 U.S. 103, 113, 95 S. Ct. 854, 43 L. Ed.2d 54 (1975), a case in which the actual issue concerned the validity of Florida procedure for determination of probable cause by a magistrate *after* the subject had been arrested without a warrant, the court said:

"Maximum protection of individual rights could be assured by requiring a magistrate's review of the factual justification prior to any arrest, but such a requirement would constitute an intolerable handicap for legitimate law enforcement. Thus, while the Court has expressed a preference for the use of arrest warrants when feasible, *Beck v. Ohio, supra,* at 96; *Wong Sun v. United States,* 371 U.S. 471, 479–482 (1963), it has never invalidated an arrest supported by probable cause solely because the officers failed to secure a warrant. See *Ker v. California,* 374 U.S. 23 (1963); *Draper v. United States,* 358 U.S. 307 (1959); *Trupiano v. United States,* 334 U.S. 699, 705 (1948)."

In a footnote to this passage the court, citing *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed.2d 564 (1971), pointed out that the issue of warrantless arrests which has generated the most controversy, and which remains unsettled, is whether and under what circumstances an officer may enter a suspect's home to make a warrantless arrest.

the laws of this state. There is no indication that the police deliberately avoided procuring a warrant for any reason; nor did any significant period of time pass between the acquisition of probable cause and the making of the arrest, during which a warrant might easily have been obtained. The arrest followed within one or two hours of Williams' placing the defendant at the scene of the crime. Under these circumstances, we conclude that defendant's claim with respect to the absence of a warrant for his arrest is without merit.

## II.  CONFESSION

A confession given by the defendant after his arrest was used by the prosecution at trial. Defendant contends that in view of his physical and mental condition at the time of his statements to the police, the evidence fails to show that those statements were voluntarily made.

■ At a hearing on the admissibility of a confession, the burden is upon the state to prove that the confession was voluntary beyond a reasonable doubt. *State ex rel. Goodchild v. Burke,* 27 Wis.2d 244, 264, 265, 133 N.W.2d 753 (1965). The inquiry is made in light of all the circumstances of the case. *McAdoo v. State,* 65 Wis.2d 596, 606, 223 N.W.2d 521 (1974). In *State v. Wallace,* 59 Wis.2d 66, 81, 207 N.W.2d 855 (1973), it was said:

"Whether a confession is voluntary 'under all of the circumstances' and therefore in conformance with constitutional standards and safeguards calls for a very careful balancing of the personal characteristics of the confessor with the pressures to which he was subjected in order to induce his statements."

Physical or mental debilitation of an accused coupled with high pressure tactics of interrogation by the police would, of course, create a strong case for exclusion of any confession the accused might make under such conditions.

■ The question of voluntariness in a particular case is one of fact, and the conclusion of the trial court that a confession was voluntarily made must stand on appeal unless against the great weight and clear preponderance of the evidence. *Grennier v. State,* 70 Wis.2d 204, 209, 234 N.W.2d 316 (1975) ; *Blaszke v. State,* 69 Wis.2d 81, 86, 230 N.W.2d 133 (1975).

The defendant was picked up at his place of employment during the afternoon of November 5th and taken to the police station. Detective Thomas Langford of the Milwaukee police testified that the defendant was not then under arrest but was brought to the station for questioning and to identify the body, which had by then been brought to the morgue. The defendant also testified that he was not then under arrest. The defendant told the police that he and the victim were married in April of 1969 and had been separated since August, 1973, because he wouldn't hold a steady job and because of some criminal charges pending against him. He said he had not seen his wife on November 4th, and he had spent the afternoon in church and in a tavern with a friend. Defendant was taken to the morgue where he identified the body, and then he went home. Langford testified that to his knowledge the defendant was not a suspect when he was picked up. Defendant became hysterical when confronted with his wife's body and said that he would find out who had done it. There is no evidence that the defendant was given *Miranda* warnings at any point during this first contact with the police.

It is true that the process of morgue identifications may be used as a strategem to break down an accused's resistance to interrogation.[3] Here, defendant identified

---

[3] In *McKinley v. State,* 37 Wis.2d 26,-154 N.W.2d 344 (1967), this court reversed a conviction on this basis, saying, at page 35:

"If our society is so civilized as to demand that a suspect be warned of his constitutional rights before questioning, and to extend to a suspect the right to remain silent and to have an

his wife's body on the afternoon of November 5th, when he was not yet in custody, and he thereafter returned home. He was not arrested, and did not confess, until the early hours of the following morning. The morgue identification was not accomplished "during the process of interrogation," and no incriminating statements were made by defendant at the time of the identification. There is no indication in this record that the police intended the morgue identification as a tactic to induce confession, or that it had such an effect in fact.

At about 3:10 a.m., November 6, 1973, detectives Bushman and Jackelen went to the defendant's parents' home, where the defendant was living. Bushman testified that the defendant was informed of his *Miranda* rights in the downstairs hallway of his parents' home, and again in the squad car on the way to the station. Bushman stated that the defendant said he understood his rights both times they were recited to him. The officers testified that the defendant at these times did not appear to be intoxicated, tired, or woozy; he did not wobble, stagger, or reel around and his language did not seem to be slurred or exceptionally blurred.

Defendant was taken to an interrogation room at the Detective Bureau, seated, offered coffee and cigarettes, and again given his *Miranda* rights. He again indicated that he understood his rights. Bushman and Jackelen told the defendant that they had information that he could possibly be involved in the homicide of his wife, and apparently proceeded then to ask him some background questions about his age, employment or the like, which he answered. Defendant said he had been in Central State Hospital for one year during 1962. The

attorney present, it must eschew the barbarism of 'corpse identification' during the process of interrogation."

See also *Bradley v. State*, 36 Wis.2d 345, 356, 153 N.W.2d 38 (1967), and *State v. Wallace*, 59 Wis.2d 66, 84, 85, 207 N.W.2d 855 (1973).

officers then asked the defendant if he wanted to tell them anything about his wife's death. Bushman said the defendant waited several minutes before answering, just sitting. No questions were asked during the interval. Then he began telling his story as follows: He had been drinking heavily on November 4, 1973. He called his wife about 2:10 p.m., talked to her about fifteen minutes, then walked over to her apartment. She let him in, and they had a conversation about her pending divorce action. She demanded that he keep a job. They had a fight, apparently physical, after which she walked into the bedroom, and he followed. She sat on the bed. He pulled the radio cord out of the wall and slipped it over her neck, apparently having also sat on the bed in the meantime. He strangled her until she fell back on the bed. He stared at the wall for about five minutes, and then pulled her panties down on one leg to make it look like rape. He left the apartment, stopped in two bars, and arrived at his parents' home about 5:30 p.m. He then called Sylvia Nelson, apparently a friend of his wife, to tell her to stay out of his business, and went to bed. Bushman testified that this story came out in basically narrative form, that he had to slow the defendant down periodically so he could write down what defendant was saying. Defendant was not being asked questions, except for periodic promptings such as "Then what?" Defendant made one phone call to his father, but otherwise requested no phone calls and never asked to stop proceedings. This interview began about 3:15 a.m. and concluded at 4:50 a.m., on November 6, 1973. The fact that defendant's statement was given between 3 and 5 o'clock in the morning was a factor to be considered on his susceptibility to police pressure.

Defendant was then booked. Detective Bushman next saw him at about 8:30 a.m. in the office of Assistant District Attorney Timothy Garrity. Garrity again in-

formed the defendant of his constitutional rights and asked him if he wanted to explain again what happened, which he then did. Bushman testified that the defendant appeared to be normal, fully awake and conscious of what he was doing and saying. He made no requests. His speech in Garrity's office was no different than it had been earlier that night: slow at times, fast other times.

Detective Jackelen's testimony at the hearing was substantially the same as that of Detective Bushman.

The defendant testified on his own behalf at the motion hearings. He said that he learned of his wife's death when the police picked him up at work, and agreed that he was not under arrest at that time. Defendant testified that he could not really say whether he was advised of his constitutional rights after he later was arrested. He attempted to explain the giving of the confessions as follows:

"I believe they just kept asking me did I strangle her and this here and that there. I didn't want to hear that no more. I get stubborn at times. When I don't want to hear, I just say anything."

Defendant thought he was tired when he talked to Detectives Jackelen and Bushman, but he did not really remember. He could not remember if he was given his rights in the district attorney's office—he wasn't paying too much attention. He said he was feeling bad the whole time he was being questioned; bad, like he lost something, like he didn't even care any more. He was asked whether he had been wide awake at the district attorney's office and said he had been so-so, half, and half not. Defendant did not claim that he ever asked for an attorney or that he had ever attempted to stop the questioning, nor did he claim that he did not in fact understand his constitutional rights in this regard. He stated that he had had no chance to sleep from the time he was arrested until

after he was finished with the district attorney, but he did not claim that he had asked to be allowed to sleep at any point.

The defense presented the testimony of Russell Stewart, an attorney who had represented the defendant in connection with other charges. Stewart testified that he saw defendant on the morning of November 6th in the lobby of the district attorney's office. At this point, defendant had apparently completed his interview with the district attorney and was waiting while the complaint was being typed. Stewart said the defendant appeared to be in a stupor; he seemed tired and had a glassy-eyed stare. Stewart addressed several questions to the defendant, but received no response, except that the defendant asked whether Stewart was representing him. Stewart replied that he was not representing the defendant as to this case. Stewart said the defendant did not seem to recognize him for several minutes, which he found surprising.

The defense does not dispute that defendant, a man with considerable prior police contact, was advised of his constitutional rights three times before his statement was given. He was asked if he wanted an attorney and said that he did not. His interrogation was not lengthy— about one hour and thirty-five minutes. The testimony of the arresting officers, which the trial court could properly have believed, was that defendant gave his statement largely spontaneously once he got started, with few direct questions being asked other than as to matters of background.

It is true that defendant was in Central State Hospital for the better part of a year in 1962. However, the record does not disclose the nature of his mental difficulties at that time, and in any event, this was some eleven years previous to his arrest in the case at bar, and there is no indication that he was suffering from any mental disorders after 1962.

■ Under these circumstances, the trial court's conclusion that the defendant's statements were voluntarily given and admissible at the trial is not against the weight of the evidence. It should therefore be sustained on this appeal.

## III. CROSS-EXAMINATION OF ROBERT LEE WILLIAMS

Defendant claims that the trial court improperly interfered with his counsel's questioning of the witness Robert Lee Williams concerning the witness's mental condition. He contends that he was seeking information material to the issue of the witness's competence, credibility and testimonial faculties, and that he was prevented from adequately impeaching the testimony of this significant witness.

At trial, the direct examination of Williams was relatively brief. Williams testified that he had spent the night of Saturday, November 3rd, with the victim, had left in the morning, returned to the victim's apartment in the afternoon, and then left again. As he was leaving the building on the afternoon of November 4th he encountered a man he identified as the defendant. After they passed on the staircase he heard a sound of someone knocking, coming from the area of the third floor near the victim's apartment. Williams testified that he had not previously met the defendant.

On cross-examination Williams was questioned concerning his mental condition. He was asked whether he had ever been treated for a mental disease or defect and whether he had ever been hospitalized for a mental disease or defect. He answered yes to each of these questions, and stated that in 1972 he had been hospitalized in Jackson, Mississippi, and in 1974, in Memphis, Tennessee, and Jackson, Mississippi. Defense counsel then asked Williams about the type of mental disease or defect

for which he had been hospitalized, but the state interposed an objection.

There followed a prolonged conference outside the presence of the jury concerning the physician-patient privilege, whether Williams was going to invoke it, and whether it had been waived. The defense claimed that Williams had waived his privilege because he had signed medical consent forms which allowed the defense to see his hospital records and talk to his doctors.[4] The validity of the consents came into question, however, and testimony on this subject was taken from Williams and from Curtis Riley, an investigator for the Public Defender's Office of the Legal Aid Society of Milwaukee. After this testimony the court found the consents and alleged waiver invalid. Williams was allowed to and did invoke the physician-patient privilege. Defendant argued then, as he does here, that the exception to the rule of privilege stated in sec. 905.04(4)(d), Wis. Rules of Evidence, relating to homicide trials, applied.[5] The trial judge

---

[4] "A person upon whom this chapter confers a privilege against disclosure of confidential matter or communication waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication. This section does not apply if the disclosure is itself a privileged communication." Sec. 905.11, Wis. Rules of Evidence.

[5] Sec. 905.04, Wis. Rules of Evidence, provides in pertinent part as follows:

"(2) GENERAL RULE OF PRIVILEGE. A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made or information obtained or disseminated for purposes of diagnosis or treatment of his physical, mental or emotional condition, among himself, his physician, or persons, including members of the patient's family, who are participating in the diagnosis or treatment under the direction of the physician.

". . .

"(4)(d) *Homicide trials.* There is no privilege in trials for homicide when the disclosure relates directly to the facts or immediate circumstances of the homicide."

correctly rejected this argument, stating that the exception "only relates to facts that are circumstances with respect to the homicide."

The cross-examination of Williams before the jury then resumed. Williams testified that his hospitalizations were not court commitments; that he had never seen or heard things which he later learned were not there; that once, in 1974, he had a lapse of memory, but that no one had ever told him that he had done something that he did not remember doing. At the time of trial, he was taking medication and had been taking medication on the date of the homicide. Williams, twenty-six, had never been convicted of any crime, except for a fight which occurred while he was in high school.

Dr. Craig Larson, a psychiatrist, was called as a court's witness. He testified that he had examined Williams that same day and concluded that as of the date of trial Williams was not suffering from any mental disease or defect, although in the past he had had three short periods of hospitalization for a mental problem.

Defense counsel made offers of proof from which it appeared that he wished to suggest to the jury that Williams' identification of the defendant as the man he saw on the stairway on the afternoon of November 4, 1973, was the product of an hallucination.

The general propriety of examining witnesses as to their mental condition insofar as it affects credibility was established by *Sturdevant v. State,* 49 Wis.2d 142, 181 N.W.2d 523, 44 A.L.R.3d 1196 (1970). Inquiry into the existence of and treatment for mental affliction is proper where it appears that a connection exists between the affliction and the reliability of the witness's testimony.[6]

---

[6] "Witnesses may be questioned regarding their mental or physical condition where such matters have bearing on their credibility.

" 'As a general rule, anything having a legitimate tendency to throw light on the accuracy, truthfulness, and sincerity of a

Although cross-examination with respect to mental condition and its possible effect upon the accuracy of testimony is proper, it does not follow that such cross-examination may proceed free of all restraint. Trial courts possess considerable latitude in determining the proper scope of cross-examination, the matter resting in the sound discretion of the court. *State v. Cydzik*, 60 Wis.2d 683, 690, 211 N.W.2d 421 (1973) ; *Edwards v. State*, 49 Wis.2d 105, 109, 181 N.W.2d 383 (1970). Thus where a trial judge allows some inquiry into the mental condition of a witness, but restricts the questioning when a certain point is reached, the question on appeal is whether in so doing the court abused its discretion.[7]

witness may be shown and considered in determining the credit to be accorded his testimony.' 98 C.J.S., *Witnesses*, p. 323, sec. 460.

" 'A witness may be cross-examined to test his intelligence, this rule applying although the court has held him competent to testify; and, as bearing on the question of the credibility of his testimony, he may be cross-examined as to his mental condition at the time of testifying, or at the time to which his testimony referred, his physical condition at that time, and his mental attitude toward the case.' 98 C.J.S., *Witnesses*, p. 381, sec. 486.

". . .

" 'The mental capacity of a witness is proper to be considered as bearing on his credibility. Thus the impaired condition of the mind either from a temporary cause, . . . or other infirmities, is deemed a proper subject of inquiry for the consideration of the jury in determining the credibility of a witness. So it may be shown that the witness has a mind or memory impaired from disease or other cause; but mere mental impairment, without more, is not sufficient to affect credibility, . . . Moreover, evidence that a witness was subject to epilepsy does not warrant disregarding his testimony in the absence of a showing as to what effect epilepsy has on the memory.' 98 C.J.S., *Witnesses*, pp. 326, 327, sec. 461." *Sturdevant v. State*, 49 Wis.2d 142, 147, 148, 181 N.W.2d 523, 44 A.L.R.3d 1196 (1970).

[7] In *Schleiss v. State*, 71 Wis.2d 733, 744–746, 239 N.W.2d 68 (1976), the court stated that expert psychiatric testimony bearing on the credibility of a prosecution witness could be received in a proper case, provided an adequate foundation for the expert's

We cannot say the judge abused his discretion in barring further cross-examination of the witness or in failing to take any other steps in regard to this testimony once the witness's mental condition was put into question. An attack upon competency does not necessarily allow an unlimited inquiry into the medical history of the witness. A cross-examiner is entitled to ask about past or present mental condition or treatment which common experience or expert testimony shows to be relevant to the witness's ability to testify. The court must weigh the potential unfairness and embarrassment to the witness of a full inquiry into his past medical history against whatever materiality the evidence might have.

We need not draw the parameters of permissibility here. We need only say that here the inquiry into the witness's mental condition permitted by the court was sufficient. The fact that Williams had been hospitalized on several occasions for mental illness was before the jury, and Dr. Larson related much of what Williams had told him regarding the history of Williams' mental problems. Dr. Larson testified as to his opinion on the witness's competency on the date of trial. The jury knew the witness had been on some kind of medication relating

opinion exists, but emphasized that whether such testimony should be received in a particular case rested with the trial court's discretion. *See also* Annot., *Cross-Examination of Witness as to his Mental State or Condition, to Impeach Comptency or Credibility*, 44 A.L.R.3d 1203 (1972). Though the cases there vary in the latitude to be afforded cross-examination regarding mental disorders, they generally support the proposition that inquiry into the existence of and treatment for mental afflictions is proper, at least where it appears that some potential connection exists between the affliction and reliability of the witness's testimony. Exclusion of evidence of this nature may constitute reversible error in a criminal case. *State v. Vigliano*, 50 N.J. 51, 232 Atl.2d 129 (1967); *Curry v. Superior Court of San Francisco*, 2 Cal.3d 707, 87 Cal. Rptr. 361, 470 Pac.2d 345 (1970); *Walley v. State*, 240 Miss. 136, 126 So.2d 534 (1961).

to his mental problems at the time of the crime, as well as at the time of the trial. Williams denied having in the past seen things he later was told had not actually occurred, which the defense apparently felt to be equivalent to the question whether he had experienced hallucinations, fantasies or delusions. The defendant had an opportunity to explore the issue and the court's decision to permit no further evidence relating to the witness's medical history was not an abuse of discretion. The jury had an opportunity to observe the witness on the stand under examination by both sides. The witness's identification of the defendant led to the defendant's arrest but it was not of great import at the trial. The defendant's confession and physical evidence were more than sufficient to establish the defendant's identity as the murderer.

## IV.  IMPROPER MATERIALS IN THE JURY ROOM

Defendant assigns as error the trial court's denial of his motion for a mistrial based on the jury's viewing certain material not admitted in evidence.

When the jury began its deliberations certain documents that had been admitted in evidence at the motion hearings but not at the trial were accidentally sent into the jury room along with the exhibits properly received in evidence. Among the fugitive documents were two police reports which revealed the fact that defendant was then on bail awaiting trial for certain sex offenses involving a child and which contained references to his mental history. When the error was discovered the improper materials were retrieved, and an examination of the foreman and other jury members was undertaken by the trial court to determine the extent to which the jury had been exposed to the contents of the documents. It

appears that the documents were read only once, one juror reading aloud to the whole group.[8]

Thereafter the trial court individually voir dired the jury on the effect of what they might have seen or heard upon their impartiality. Each juror was asked, in substance, whether he or she could disregard the information in the reports and render a just verdict solely upon the evidence properly received. Each juror answered in the affirmative. A motion by the defense for a mistrial was then denied.

Before the jury returned to its deliberations the judge explained to them that the reports' presence in the jury room had resulted from a mistake by court personnel

---

[8] Although the transcript states the documents were sealed and made a permanent part of the record they are not part of the record before this court. The police reports, which appear to be the only documents defense counsel found objectionable, are not part of our record either. Our only knowledge of the contents of the reports is a brief description supplied by defendant's counsel to the trial judge, which normally would not support review.

In *Schimke v. Milwaukee & Suburban Transport Corp.*, 34 Wis.2d 317, 149 N.W.2d 659 (1967), this court declined to review the contention that a mistrial should have been granted due to illness of some of the jurors, where the record on appeal did not contain a transcript or other report of the pertinent facts. The court said, at page 320:

"The rule is well established that the review of the supreme court is limited to the record; we are powerless to review a question of fact which is based upon testimony or other acceptable information not preserved on appeal."

Individual voir dire of the jury was conducted at the suggestion of the prosecutor, and curative instructions were given by the court, all at the expense of considerable time, and we doubt that all of this would have been done if the documents did not contain some cause for concern. On the whole, we think it reasonable to conclude that defense counsel's description of the contents, as far as it went (with no challenge by the state which had numerous opportunities to do so), provides adequate basis for limited review by this court.

not attributable to either party. The court also gave the following instruction:

> "You are instructed that you must disregard, ladies and gentlemen, each and every one of these documents which were mistakenly placed before you.
> "You are to decide, ladies and gentlemen, the case solely upon the basis of the evidence brought out at the trial as elicited on this witness stand and the exhibits that are properly before you.
> "You may now retire to your deliberations. Thank you very much for your kind patience. I am very sorry."

The jury then deliberated some ten additional hours, including a return to court to be reinstructed on the elements of first and second degree murder, before returning a verdict of guilty of murder in the first degree.

Defendant contends that the unfortunate incident we have described hopelessly prejudiced his case and that notwithstanding the protective measures taken by the trial court, declaration of a mistrial was required. Defendant's motion for a mistrial was addressed to the sound discretion of the trial court, and its denial of the motion will not be reversed unless that discretion was abused. *Oseman v. State*, 32 Wis.2d 523, 528, 145 N.W.2d 766 (1966).

We do not believe the granting of a mistrial was required. It appears that the offending material was read but once to the jury, by one of its members, and was not circulated among them or dwelt upon at length. While charges of sexual misconduct with a child might reflect badly on the defendant in the minds of the jury, the charges are dissimilar to the offense for which defendant was then being tried; and, as the state points out in its brief, the defendant had testified to having nine prior criminal convictions, so the jury already knew that his record was not free of blemishes. As for the references to defendant's mental history, defense coun-

sel's statement indicates only that such references were contained in the documents read by the jury, without elaborating at all on what the references were. We assume that the reference was to defendant's 1962 commitment to Central State Hospital because no other matters of this nature appear anywhere in the record. Knowledge of a period of confinement in a mental hospital was not in itself so prejudicial as to require that a mistrial be declared, and this court cannot assume that more specific information of a prejudicial nature was involved.

Balanced against the possible prejudicial nature of the documents, the steps taken by the trial court to mitigate any prejudice must be considered. The trial court individually voir dired the jurors and instructed them collectively to disregard the fugitive materials and to deliberate only upon the evidence properly received. In view of the limited knowledge we have as to the nature of the offending documents, and considering also the fact that evidence of the defendant's guilt was very strong, we cannot say that under the circumstances the trial court abused its discretion when the motion for a mistrial was denied.[9]

[9] Defendant claims that the trial court erred in allowing certain photographs of the murder victim to go into the jury room during deliberations. He concedes, correctly, that determination of what exhibits, if any, are to go with the jury is a matter for the discretion of the court. *Robinson v. State*, 52 Wis.2d 478, 484, 190 N.W.2d 193 (1971). However, he claims that such discretion was here abused. He argues that the fact, location and manner of the deceased's death were not in dispute, rendering the photographs unnecessary to the jury's consideration of the case, while they would, because of their subject matter, tend to excite the passions of the jury against him. The photographs are somewhat unpleasant to look at, but not extremely so, and not at all sensational or revolting. While it is true that the defendant did not actively dispute the fact or manner of death, he did deny and attempt to discredit his confession, and the photographs taken at the scene provide strong corroboration of that confession in several respects. The defense tried very hard

## V. INSTRUCTIONS ON DEFENSE THEORY OF THE CASE

Defendant claims error in the trial court's refusal to give certain requested instructions on the defense theory of the case. The court denied the following instructions:

"It is the defendant's theory of the case that Robert Lee Williams did not see George Johnson on the stairwell of the apartment building at 1733 North Cambridge on the afternoon of November 4, 1973."

"It is further the defendant's theory of the case that the circumstances surrounding the taking of the statements of George Johnson was such that the statements are not trustworthy or reliable."

"It is further the defendant's theory of the case that George Johnson did not on November 4, 1973, between the hours of 3:15 p.m. and 5:00 p.m., at 1733 North Cambridge Street, Apartment #312, in the City and County of Milwaukee, State of Wisconsin, intentionally and feloniously cause the death of Cynthia Johnson, d. o. b. 4/24/48, another human being, with intent to kill said person."

The first instruction, asserting the theory that Williams did not see the defendant, seems simply to raise the question of Williams' credibility and the accuracy of his identification. The jury was adequately instructed with respect to both credibility and identification of a defendant. Generally, in instructing on the rules for determining the credibility of witnesses the court should not single out any particular witness. *Koss v. State,* 217 Wis. 325, 333, 258 N.W. 860 (1935). There was no need for the court to give the first requested instruction.

The second instruction dealt with the reliability of defendant's confession. The jury was given Wis. Jury

to discredit Robert Lee Williams, and one of the photographs provides some corroboration of Williams' testimony. We do not find an abuse of discretion.

Instruction—Criminal Nos. 180 and 182 which cover the points made in defendant's instruction.

The third requested instruction is simply the charging portion of the complaint, with the addition of the word "not." It is simply a denial of the crime, the equivalent of a plea of not guilty. This "theory" was adequately covered when the court, at the opening of its charge to the jury, read the charging portion of the complaint, and continued:

> "To this charge in this criminal complaint, ladies and gentlemen, the defendant has entered a plea of not guilty, which means a denial of every material allegation in the complaint."

There was no error in refusing the defendant's "theory of the defense" instructions.

## VI. PROSECUTOR'S ARGUMENT TO THE JURY

Defendant contends that he was prejudiced by certain remarks made by the prosecutor in his closing argument. Arguments were not recorded in this case, but the court allowed defense counsel to state his objections on the record after the prosecutor's initial argument, and again after his rebuttal.

After the state's closing, defendant objected to (1) "the reference that Detective Mehl thought it was a big act because that was a conclusion being improperly placed in evidence;" (2) "the comments regarding Dr. Larson's testimony as to Williams' ability to remember because I was foreclosed from asking certain questions of Dr. Larson;" (3) "his arguing to Assistant District Attorney Garrity's credibility because that has never been put into issue;" (4) "the reference to the medical examiner knowing about the position of the murderer because, I believe, the court excluded that yesterday."

After the state's rebuttal, defendant objected to: (1) "his comment that they did not test for seminal stains. They did, but it was never put into evidence;" (2) "the statement that the defendant said he got to bed at six. I don't believe that was his testimony." (3) "to the comment, 'In my mind, he is guilty.' " (4) "he was arguing the type of neighborhood around there. That was never put in evidence." (5) "he's been talking about what happens in confessions. Again, that, that is not a proper argument."

In both instances, after counsel finished stating his objections, the court simply said that they were noted, and ordered that the jury be brought back out. No comment was made by the prosecutor.

The circumstances in which unreported closing arguments may be reviewed were discussed in *Smith v. State*, 65 Wis.2d 51, 221 N.W.2d 687 (1974). In *Smith* the court emphasized the need, if review is to be had, for establishing with accuracy exactly what was said:

"The reasons for not undertaking review where the exact remarks are not in the record are obvious. Slight changes in wording, emphasis and context may materially alter the perceived substance of the remarks." 65 Wis.2d at 54.

For this reason, the court has reviewed unreported remarks only when they were admitted on the record by the attorney who made them, or were reconstructed by the trial court.[10]

It is obvious that no review can be had based upon the descriptions of the prosecutor's remarks outlined above. Several of them are incomprehensible, and in none may the context of the remark be discerned. In only one ("In my mind, he is guilty.") did counsel set out the exact nature of what he claims the prosecutor said, and

---

[10] *See* cases cited in *Smith v. State, supra*, at 54.

the propriety of this remark could not be determined without knowing whether, in context, the opinion was stated to be based upon the evidence, which is allowed, or whether it was offered merely as the personal feeling of the prosecutor, which would be improper. *See State v. Cydzik,* 60 Wis.2d 683, 695, 211 N.W.2d 421 (1973). In any case, the prosecutor did not, either expressly or by silence when a response was appropriate, admit that any of the alleged remarks were actually made, *Smith, supra,* nor were the remarks reconstructed by the trial court. Unverified, unsupported, and imprecise recollections of one trial counsel as to what was said by his opponent cannot form a basis upon which this court can act on appeal.

Moreover, as the state points out in its brief, no motion for a mistrial based upon improper argument was ever made. This court has held many times that objections to improper argument are waived if a motion for a mistrial on this ground is not timely made. *Sanders v. State,* 69 Wis.2d 242, 263, 230 N.W.2d 845 (1975); *Davis v. State,* 61 Wis.2d 284, 287, 212 N.W.2d 139 (1973), and cases there cited. For these two reasons, then, this contention of defendant cannot be sustained.

## VII.  NEW TRIAL IN THE INTEREST OF JUSTICE

The conditions under which a new trial in the interest of justice is appropriate were stated in *Lock v. State,* 31 Wis.2d 110, 118, 119, 142 N.W.2d 183 (1966):

". . . In order for this court to exercise its discretionary power under sec. 251.09, Stats., it should clearly appear from the record that for some reason it is probable there has been a miscarriage of justice. In order for this court to exercise its discretion and for such a probability to exist we would at least have to be convinced that the defendant should not have been found guilty and that justice demands the defendant be given

another trial. In their brief the defendants list six reasons why a new trial should be granted in the interests of justice. However, none of these reasons tends to indicate the defendants were denied a fair trial or that a new trial would probably result in their acquittal. True, the defendants hope to be able to convince a new jury or the court as the trier of the fact of the truth of their story rather than of the testimony of the complaining witness, but hope is not a sufficient ground to grant a new trial in the interests of justice."

The requisite conditions do not exist here.

*By the Court.*—Judgment and order affirmed.