Patrick **ARROWOOD,**
Petitioner-Appellant,

v.

Donald **CLUSEN,** Respondent-Appellee.

No. 83–1855.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 18, 1984.

Decided May 2, 1984.

Rehearing Denied May 24, 1984.

William J. Tyroler, Wis. Public Defender, Milwaukee, Wis., for petitioner-appellant.

Stephen W. Kleinmaier, Wis. Dept. of Justice, Madison, Wis., for respondent-appellee.

Before BAUER and FLAUM, Circuit Judges, and SWYGERT, Senior Circuit Judge.

FLAUM, Circuit Judge.

On this appeal from an order denying the appellant's petition for a writ of habeas corpus, the appellant ("petitioner") asserts claims of ineffective assistance of counsel. For the reasons set forth below, we affirm in part and reverse in part.

In a complaint issued on August 14, 1979, the petitioner was charged with first-degree sexual assault (Count 1) and first-degree murder (Count 2). After a preliminary hearing, at which the petitioner was bound over for trial, the petitioner filed a motion to suppress statements that he had given to the police on the morning of the murder. At the suppression hearing, which took place on October 5, 1979, the petitioner presented no evidence. The prosecution produced five witnesses, who testified to the following events.

At approximately 4:45 a.m. on August 13, 1979, police officers Daniel Petersen and James Daly were dispatched to the home of the petitioner in Racine, Wisconsin. The petitioner, who was crying, told the officers that he had overheard several people say that they had killed someone. He further stated that he had seen the body in a nearby park. The officers asked the petitioner to accompany them to the park, where the petitioner directed the officers to the body of a woman lying in a river. After finding the body, Officer Daly asked the petitioner to recount what happened. The petitioner explained that he was in the park at about 2:00 a.m., drinking beer with several men who he did not know, when a woman approached. At that point, according to the petitioner, he passed

out. When he awoke, one of the men said that they had "nailed" the woman and that she was dead. The three men then left, and the petitioner found the body as he was looking for his car keys.

Officer Petersen proceeded to inform the petitioner of his *Miranda* rights, though he explained to the petitioner that he was not in custody or under arrest. The petitioner agreed to talk further about the homicide, and he took the officers to the spot in the park where he had overheard the men discuss the murder. The petitioner then consented to give a statement at the police station. Officer Daly and the petitioner arrived at the police station at about 6:00 a.m.

At 6:11 a.m., police detective Thomas Cooper gave the petitioner the *Miranda* warnings. After the petitioner signed a waiver of rights form at 6:14 a.m., Detective Cooper interviewed him until 7:15 or 7:30 a.m. During this time, the petitioner repeated the story that he had related to Officer Daly. At about 9:00 a.m., Detective Cooper received new information regarding evidence found at the scene.[1] When confronted with this information, the petitioner suggested that he accompany Detective Cooper and another detective to the scene. The petitioner and the detectives arrived at the park at about 10:00 a.m., and the petitioner showed the detectives where he had been sitting when he passed out. Officer Petersen, who was still at the scene, informed the petitioner that he was not pointing to the spot that he had indicated earlier. The petitioner admitted that he had lied to the police officers earlier in the morning. He then gave a new statement, describing how he and three members of the High Riders motor-

cycle gang had sexual intercourse with the victim. When she resisted, one of the High Riders struck and killed her.

The detectives then asked the petitioner to come to the police station, where he could view photographs and give a written statement. The petitioner and the detectives returned to the station at about 11:15 a.m., and they had lunch in the patrolmen's lounge. After lunch, at about 12:15 p.m., the petitioner repeated his story about the High Riders, while Detective Cooper prepared an affidavit. Before the affidavit was completed, the detectives received information that cast doubt upon the petitioner's story.[2] When the detectives confronted the petitioner with this information at about 2:00 p.m., the petitioner admitted that no High Riders had been in the park, and he proceeded to give his third account of the events of the evening. He stated that he met the victim at a tavern and took her to the park, where he made sexual advances that she resisted. When she fled,[3] the petitioner chased her and had sexual intercourse with her. Afterward, the petitioner knocked her down and left the area. At this point in the petitioner's narration, Detective Cooper asked rhetorically who could have killed the victim, if the petitioner had not. The petitioner responded by requesting an attorney. No further questions were asked, the petitioner was placed under arrest, and Detective Cooper allowed the petitioner to call his wife and his attorney.

The trial court denied the motion to suppress the petitioner's pretrial statements. At the petitioner's trial, which began on February 26, 1980, Officer Daly and Detective Cooper testified to the events outlined above. In addition, the prosecution produc-

---

**1.** At trial, Detective Cooper explained that police officers at the crime scene had found the petitioner's car keys on the west side of the river—an area where the petitioner said he had never been. Trial Tr. at 495.

**2.** The detectives learned that a witness had seen the petitioner with the victim at a tavern on the night before the victim's death. Pretrial Motion Hearing Tr. at 102.

**3.** At this point in his narration, the petitioner stated that a silver car pulled up alongside the victim as she was fleeing and that two men jumped out of the car and started chasing the victim. The detectives told the petitioner that they did not believe a silver car came on the scene. The petitioner made no further reference to the silver car and continued his account by describing how he ran after the victim. Pretrial Motion Hearing Tr. at 103.

ed a witness who, in the early morning of August 13, 1979, saw the victim and the petitioner leave a tavern together. Another witness, an acquaintance of the petitioner who was with him at the tavern, testified that he followed the petitioner's car to the park and observed the petitioner in the company of the victim, who was very intoxicated. After telling the petitioner to take the victim home, the witness left the park when it appeared that the petitioner was helping the victim into his car. Additional prosecution witnesses testified that blood stains on the petitioner's overalls, shirt, and shoes were of the same blood type as the victim's blood; that a rectal swab taken from the victim's body indicated an elevated amount of acid phosphatase, an enzyme that is present in high quantities of semen; that seminal components were present in a stain on the front of the petitioner's jockey shorts; that the victim's hearing aid and the petitioner's car keys were found within three or four feet of each other, near drag marks on the footpath leading to the victim's body; and that the victim died of drowning after she sustained head injuries caused by a beating.

The petitioner took the stand at trial and testified that he met the victim in a tavern and offered her a ride home. He said that they went to the park, walked around for awhile, and were going to have sex. As the victim was undressing, she mentioned the petitioner's wife. The petitioner told her to "knock it off," and when the victim persisted, the petitioner hit her in the face with the back of his hand. Trial Tr. at 697. According to the petitioner, the victim hit him in the face and went for his eyes. He "hit her some more," and she fell to the ground. *Id.* at 698. After throwing the victim's clothes in the bushes, the petitioner ran to his car. The victim got up and began running along the footpath, toward the petitioner's car. The petitioner further testified that when he reached his car, he discovered that he had lost his car keys. He was unsuccessful in his attempts to start the car with a screwdriver, and he returned along the footpath with a flashlight, looking for his keys. While search-

ing for the keys, he found the victim in the river and attempted to pull her out. When he could not, he ran home and told his wife that he found the body.

The jury returned verdicts of guilty on both counts, and the petitioner was sentenced to life imprisonment plus thirty years. In post-trial motions, the petitioner alleged that he had been deprived of effective assistance of counsel. After a post-conviction hearing, the trial court denied the motions. The Wisconsin Court of Appeals affirmed the convictions. The Wisconsin Supreme Court granted discretionary review, but it later ruled that such review was improvidently granted. The petitioner then filed a petition for a writ of habeas corpus in federal district court. That petition was denied. In appealing this denial, the petitioner claims that his trial counsel was ineffective in several respects. First, the defense counsel failed to present the petitioner's wife and sister as witnesses at the pretrial suppression hearing. Second, the defense counsel exposed the petitioner to damaging prosecutorial comments about his pretrial exercise of the right to counsel. Third, the defense counsel failed to request jury instructions regarding the trustworthiness of pretrial statements. Fourth, the defense counsel failed to elicit testimony from the petitioner at trial in support of the defense theory that the petitioner's pretrial statements were untrustworthy. Fifth, the defense counsel failed to investigate and present as a witness at trial the petitioner's sister, who possessed relevant information pertaining to the trustworthiness of the petitioner's pretrial statements.

## REVIEWABILITY OF CLAIMS

■ As a threshold matter, the respondent contends that the petitioner's claims regarding the defense counsel's failure to present witnesses at the suppression hearing and his failure to elicit testimony from the petitioner at trial are not properly before us. The Wisconsin Court of Appeals found that the record was insufficient to reach these claims because the defense

counsel was never asked, at the post-conviction hearing, to provide reasons for the allegedly incompetent omissions. According to the respondent, the petitioner's failure to comply with state procedural rules regarding the conduct of the post-conviction hearing precludes the petitioner from arguing these claims in the federal courts.

After careful review of the transcript of the post-conviction hearing, we conclude that the record provides a sufficient basis upon which to review both claims. First, the defense counsel clearly stated during the post-conviction hearing that he was not aware that the petitioner's sister possessed information that would be helpful at the hearing to suppress the petitioner's pretrial statements. Post-Conviction Hearing Tr. at 32–33. He also said that he could not remember whether his failure to call the petitioner's wife as a witness at the suppression hearing was related to her fear of the prospect of testifying. *Id.* at 34. Further explanation regarding the failure to present these witnesses at the suppression hearing apparently was not within the defense counsel's memory. Second, the defense counsel pointed out at the post-conviction hearing that the petitioner was the best witness to testify about the petitioner's emotional condition during the police interrogations. *Id.* at 32. This point clearly indicates the defense counsel's view that full information regarding the interrogations and the trustworthiness of the pretrial statements should have been elicited from the petitioner while he was testifying at trial.[4]

■■■ A federal court may consider those claims asserted in a federal habeas corpus petition that have been fairly presented to the state courts. *Toney v. Franzen,* 687 F.2d 1016, 1021 (7th Cir. 1982). "A federal habeas corpus petitioner has 'fairly presented' a claim to a state court if he has clearly informed the state court of the factual basis of that claim and

has argued to the state court that those facts constituted a violation of the petitioner's constitutional rights." *Id.* See also *Parker v. Parratt,* 662 F.2d 479, 482 (8th Cir.1981) ("the state court need not rule on the merits of an issue before the federal habeas court does. It is enough that the state court was on notice of the question and was presented with the opportunity to rule on the same question raised in the federal habeas petition"), *cert. denied,* 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 91 (1982). In the present case, our review of the record convinces us that the petitioner fairly presented, and the Wisconsin Court of Appeals had fair opportunity to review, the petitioner's claims regarding his trial counsel's failure to present witnesses at the suppression hearing and his counsel's failure to elicit testimony at trial. Thus, although the state appellate court refused to reach these claims, we hold that they are properly before us.

## INEFFECTIVE ASSISTANCE OF COUNSEL

■■■ This circuit has addressed the issue of ineffective assistance of counsel in a number of recent decisions. It is clear, from these cases, that there is a presumption of adequate representation and that the burden is on the criminal defendant to show that a trial counsel's performance was constitutionally inadequate. *United States v. Zylstra,* 713 F.2d 1332 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 403, 78 L.Ed.2d 344 (1983); *United States v. Phillips,* 640 F.2d 87, 92 (7th Cir.), *cert. denied,* 451 U.S. 991, 101 S.Ct. 2331, 68 L.Ed.2d 851 (1981); *Cyburt v. Rowe,* 638 F.2d 1100, 1105 (7th Cir.1981); *United States v. Fleming,* 594 F.2d 598, 607 (7th Cir.), *cert. denied,* 442 U.S. 931, 99 S.Ct. 2863, 61 L.Ed.2d 299 (1979). It is also clear that, to be constitutionally inadequate, a defense counsel's performance must fail to

---

**4.** The record does not reflect that the defense counsel failed to elicit testimony from the petitioner at trial because he thought it to be false. Indeed, the defense counsel stated at the post-conviction hearing that he believed that one unelicited item of testimony, the fact that the petitioner had asked to go home during the police interrogations, was "definitely" important. Post-Conviction Hearing Tr. at 41.

meet a minimum standard of professional representation. *United States ex rel. Williams v. Twomey,* 510 F.2d 634, 641 (7th Cir.), *cert. denied,* 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975). *See also United States v. Berkwitt,* 619 F.2d 649, 658–59 (7th Cir.1980); *United States ex rel. Ortiz v. Sielaff,* 542 F.2d 377, 379 (7th Cir.1976). This minimum standard has been defined as "representation without serious prejudicial blunders which have foreseeable adverse consequences." *United States v. Bradshaw,* 719 F.2d 907, 918 (7th Cir.1983) (quoting *Guzzardo v. Bengston,* 643 F.2d 1300, 1305 (7th Cir.), *cert. denied,* 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981)). A reviewing court may only consider those acts or omissions that are not classifiable as an attorney's tactics, *United States v. Weston,* 708 F.2d 302, 306 (7th Cir.), *cert. denied,* —— U.S. ——– ——, 104 S.Ct. 397–98, 78 L.Ed.2d 340 (1983), and it must view the prejudicial effect of these acts or omissions in light of the totality of the circumstances. *See United States v. Zylstra,* 713 F.2d at 1338; *Wade v. Franzen,* 678 F.2d 56, 58 (7th Cir.1982).

■ In its most recent pronouncement on the issue of prejudice, this court has indicated that, to establish ineffective assistance, the defendant need only show that the trial counsel's acts or omissions "may have impaired the defense." *United States ex rel. Cosey v. Wolff,* 727 F.2d 656, 658–59 (7th Cir.1984). Once such a showing has been made, it is the government's burden "to prove beyond a reasonable doubt that the trial counsel's ineffective assistance did *not* affect the verdict." *Id.* The question is whether the defendant would have been found guilty if his original trial counsel had performed competently. *Id.* at 659.

Applying this precedent to the facts of this case, we consider the petitioner's claims of ineffective assistance.

#### Failure To Present Witnesses At Pretrial Suppression Hearing

At the post-conviction hearing, the petitioner's wife, Lori Johnson, testified that on the morning of August 13, 1979, she briefly spoke to the petitioner at the police station, as the petitioner was being led out of an interrogation room. He told her that the police "tried to pin it on him" and that he only wanted to go home and sleep. Post-Conviction Hearing Tr. at 7. Johnson further testified that she asked a police officer if she could take the petitioner home, but the officer replied that the police "were not finished with him." *Id.* Johnson stated that she informed the defense counsel of these encounters. Although the defense counsel told her that she might serve as a witness, she was not called to testify either at the suppression hearing or at the trial.

The petitioner's sister, Debra Hamilton, also testified at the post-conviction hearing. She stated that she was at the police station on the morning of August 13 and that she overheard the petitioner tell Johnson that the police were "trying to pin it on him." *Id.* at 4. Hamilton described the petitioner as being very tired, confused, and upset. According to Hamilton, the defense counsel never discussed the events of that morning with her. He only spoke to her about "everyday things" and about "how pretty [she] was." *Id.* at 5.

■ The petitioner contends that his trial counsel rendered ineffective assistance by failing to present both Johnson and Hamilton as witnesses at the hearing to suppress his pretrial statements. We disagree. At the post-conviction hearing, the defense counsel stated that he was aware of Johnson's observations at the police station, but that he did not present her as a witness at trial because he thought she would be too nervous and because the defendant did not want her to testify. The fact that the defense counsel could not recall whether these reasons also led to his decision not to present Johnson at the preliminary hearing does not demonstrate that this decision " 'resulted from neglect or ignorance rather than from informed, professional deliberation.' " *United States v. Weston,* 708 F.2d at 307 (quoting *Marzullo v. Maryland,* 561 F.2d 540, 544 (4th Cir.1977), *cert. denied,* 435 U.S. 1011, 98 S.Ct. 1885, 56

L.Ed.2d 394 (1978)). We thus are not persuaded that the failure to call Johnson as a witness at the suppression hearing was other than a tactical decision, and we do not find it to be error.

■ The defense counsel admitted at the post-conviction hearing that he did not question Hamilton about her observations at the police station. He said that he knew she had gone to the station, but he did not think she had seen the petitioner while she was there. It is undisputed that a defense counsel "should make reasonable investigations into all defenses," *United States v. Zylstra,* 713 F.2d at 1338, and that such investigations encompass the interviewing of witnesses. *United States v. Decoster,* 624 F.2d 196, 209 (D.C.Cir.1976) (en banc) (plurality opinion). In the present case, the defense counsel's failure to interview Hamilton and to present her testimony at the suppression hearing was clearly negligent and not tactical.[5] However, we are not convinced that this error may have impaired the petitioner's defense.

At a suppression hearing in the state of Wisconsin, the prosecution must prove beyond a reasonable doubt that a defendant's confession was voluntary. *State ex rel. Goodchild v. Burke,* 27 Wis.2d 244, 264–65, 133 N.W.2d 753, 763–64 (1965). *See also State v. Verhasslet,* 83 Wis.2d 647, 653, 266 N.W.2d 342, 345 (1978); *Johnson v. State,* 75 Wis.2d 344, 352, 249 N.W.2d 593, 598 (1977). The trial court conducts the inquiry in light of all the circumstances of the case, and it carefully balances the personal characteristics of the defendant with the pressures to which he was subjected. *State v. Wallace,* 59 Wis.2d 66, 81, 207 N.W.2d 855, 863 (1973). *See also Johnson v. State,* 75 Wis.2d at 352, 249 N.W.2d at 598. The transcript of the suppression hearing in the present case reveals that the government presented strong evidence of voluntariness through the testimony of the police officers who were with the petitioner throughout the morning of the murder. We cannot conclude, in light of all the circumstances of the case, that Hamilton's brief observations that the petitioner was upset and that he thought the police were "trying to pin it on [him]" could have cast reasonable doubt upon the evidence of voluntariness. The government witnesses acknowledged the fact that the petitioner was upset, but they maintained that the petitioner, who initiated contact with the police, agreed to cooperate in the investigation of the crime. In addition, Hamilton's observations did not indicate that the petitioner's vague statement regarding attempts "to pin it on [him]" referred to anything more than the fact that the petitioner was being closely questioned about his activities at the time of the victim's death. The petitioner thus has not shown that Hamilton's testimony could have affected the admissibility of the petitioner's pretrial statements and that the defense counsel's error in failing to present this testimony at the suppression hearing may have impaired the petitioner's defense.

### Exposure of Defendant to Prosecutorial Comments on Exercise of Right to Counsel

■ In the government's opening statement to the jury and during its case in chief, the prosecutor referred to the petitioner's invocation of his right to counsel on the afternoon of August 13, 1979. The defense counsel did not object to these references. Furthermore, in closing argument, the defense counsel stated that it was normal police practice to require signed statements from witnesses, and he pointed out that the petitioner never signed such a statement. The prosecutor responded by referring once again to the petitioner's invocation of the right to counsel and to the resulting termination of police interrogation.

The petitioner claims that the defense counsel rendered ineffective assistance by failing to object to the prosecutor's impermissible references to the petitioner's exer-

---

**5.** At the post-conviction hearing, the defense counsel admitted that he would have called Hamilton as a witness if he had known that she had seen the petitioner at the police station. Post-Conviction Hearing Tr. at 33.

cise of rights. He further claims that the defense counsel's argument regarding signed statements was unsupportable and unreasonably exposed the petitioner to prejudicial comment from the prosecutor. At the post-conviction hearing, the defense counsel testified that he did not object to impermissible prosecutorial comments because he "didn't think there was anything to be gained from objecting." Post-Conviction Hearing Tr. at 25. Moreover, the defense counsel explained that he raised the absence of a signed statement during his closing argument in order to discredit the police officers' testimony that the petitioner had been cooperative. *Id.* at 29–30.

After reviewing both the trial transcript in this case and the post-trial explanations of the defense counsel, we hold that the defense counsel's decisions to refrain from objecting to prosecutorial comments and to choose a particular line of argument were matters of "trial tactics within the range of professional competence." *United States v. Murzyn*, 631 F.2d 525, 534 (7th Cir.1980), *cert. denied*, 450 U.S. 923, 101 S.Ct. 1373, 67 L.Ed.2d 351 (1981). We will not examine such tactics in the light of subsequent events. *United States v. Phillips*, 640 F.2d at 92–93.[6]

Failure to Request Instructions and to Present Testimony Regarding Trustworthiness of Petitioner's Pretrial Statements

■ As he explained at the post-conviction hearing, the defense counsel believed that the petitioner was tired and frightened during the police interrogations, that he was not free to leave police custody, and that he made pretrial statements in order to satisfy the police and secure his release. Consistent with this theory, the defense

counsel cross-examined Detective Cooper at trial on the issue of the trustworthiness of the petitioner's pretrial statements. Detective Cooper acknowledged that, on the morning of August 13, 1979, the petitioner had not slept for at least twenty-four hours, that the petitioner had been drinking the night before, and that the petitioner said several times that he was tired. Detective Cooper also revealed on cross-examination that the petitioner appeared to have had an "emotional experience," Trial Tr. at 537, and that the petitioner said he wanted to go home as soon as the officers were finished talking with him.

The petitioner contends that in view of the defense theory that the pretrial statements were untrustworthy, the defense counsel committed three errors that constitute ineffective assistance of counsel. First, the defense counsel failed to request Wisconsin Pattern Jury Instruction 180, which provided:

Before [a jury] may consider any statement made by the defendant as evidence against him, [it] must find beyond a reasonable doubt that the defendant made it and that it is trustworthy.

.     .     .     .     .

In considering whether, any statement or part of it is trustworthy, [the jury] should consider ... the physical facts surrounding the defendant at the time the statement was made ... [and] the defendant's psychological response to the surrounding physical facts.

At the time of the petitioner's trial in 1980, this instruction specifically had been upheld as an accurate statement of Wisconsin law. *See McKinley v. State*, 37 Wis.2d 26, 41–44, 154 N.W.2d 344, 351–52 (1967).[7]

---

**6.** The petitioner also argues that the defense counsel inadequately developed a theory of defense, coercive interrogation, which opened the door to prosecutorial comments about the petitioner's invocation of rights. The result, according to the petitioner, "was to expose [the petitioner] to extremely prejudicial comments without adducing known, readily available defensive evidence which would have established coercion." Pet. Brief at 44. We find that the choosing of a defense that may open the door to

otherwise impermissible prosecutorial comment is a tactical decision that we will not examine in light of subsequent developments at trial. *See United States v. Phillips*, 640 F.2d at 92–93. The adequacy of the defense counsel's development of this defense will be examined in the next section of this opinion.

**7.** Wisconsin Pattern Jury Instruction 180 was revised extensively in November 1981, and now reads in relevant part as follows:

At the post-conviction hearing, the defense counsel admitted that he had erred in failing to request Instruction 180 and that he "just didn't think about it." Post-Conviction Hearing Tr. at 38. The Wisconsin Court of Appeals, however, ruled that there was no ineffective assistance and denied the petitioner's request for a writ of habeas corpus. It found that the defense counsel had explained the issue of trustworthiness to the jury in closing argument, and it concluded the failure to request the instruction was more a reflection of the heat of trial than of incompetence. We cannot agree that this finding and conclusion are fairly supported by the record.[8] During closing argument, the defense counsel reviewed the factors that indicated the untrustworthiness of the defendant's pretrial statements, but he did not inform the jury of the state's heavy burden to prove trustworthiness beyond a reasonable doubt. Moreover, the "heat of trial" does not provide a tactical basis for the failure to request a proper instruction and cannot insulate this omission from review. Given the fact that Instruction 180 was critical to the proper presentation of one of the defense theories, which was developed during cross-examination of the principal police detective, and given the lack of tactical basis for the failure to request this instruction, we find that the failure constitutes error. Moreover, we find that this error may have prejudiced the defense. If the jurors had

received Instruction 180, they may well have excluded the pretrial statements from their deliberations.

Second, the petitioner argues that he received ineffective assistance because the defense counsel failed to elicit crucial testimony from the petitioner regarding the police interrogations. At the post-conviction hearing, the petitioner testified that he told the police officers on about nine occasions during the questioning that he was tired and wanted to go home, but the police ignored his requests. Post-Conviction Hearing Tr. at 11–12. He also stated that in the afternoon of August 13, when he was telling the police his third version of the events of the prior night, he "was falling asleep at [the] table." *Id.* at 14. According to the petitioner, he informed his counsel of these details, but they were never elicited from him while he was on the witness stand. We find that this failure to elicit crucial testimony from the petitioner constitutes error. At the post-conviction hearing, the defense counsel testified that, as part of his theory of defense, he sought to show that the petitioner was tired and frightened during the interrogations. Yet, when the defense counsel delegated the direct examination of the petitioner to an associate who had not been present at trial during the cross-examination of Detective Cooper, he failed to mention this theory.[9]

[I]f you find that the statement was made by the defendant and accurately restated here at trial, you must determine whether the statement is trustworthy. "Trustworthy" simply means whether the statement ought to be believed.

You should consider the facts and circumstances surrounding the making of (the) (each) statement, along with all the other evidence in the case, in determining how much weight, if any, the statement deserves.

8. *See* 28 U.S.C. § 2254(d)(8) (1982):

In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a

written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, ... unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record.

9. The record reflects that this associate of the defense counsel appeared in court for the first time near the end of the state's presentation of evidence, after the cross-examination of Detective Cooper. Trial Tr. at 624 ("[I]t seems I'm popping in in the middle of the trial").

In an affidavit filed in the Wisconsin Supreme Court, the associate testified that he regularly

Consequently, when the petitioner took the stand, the associate asked him only limited questions about his condition during the interrogations, and the full scope of the petitioner's physical fatigue and the police officers' possible abuse of their authority was never explored. This error, furthermore, may have impaired the defense. The petitioner's testimony that his requests to go home were ignored and that he was unable to stay awake may have raised reasonable doubt that his pretrial statements were trustworthy.

Third, the petitioner maintains that his counsel was ineffective by failing to investigate and to present as a witness at trial the petitioner's sister, Debra Hamilton, who observed that the petitioner was tired and upset on the morning of the murder, and who overheard him tell his wife that the police were trying to pin the murder on him. While the failure to investigate Hamilton was nontactical error, *see supra* at 1369, we cannot conclude that the absence of Hamilton's testimony at trial may have impaired the defense. Hamilton's brief observation that the petitioner was tired and upset was cumulative of the testimony of Officer Daly and Detective Cooper.[10] Furthermore, we are not convinced that a vague assertion regarding an attempt to pin the murder on the petitioner could have caused reasonable doubt as to the trustworthiness of the pretrial statements.

In light of our determination that the defense counsel's failure to request Instruction 180 and failure to elicit testimony from the petitioner constituted ineffective assistance of counsel that may have impaired the defense, the burden shifts to the

government to prove beyond a reasonable doubt that this ineffective assistance did not affect the verdicts. We must consider whether the petitioner would have been found guilty if his trial counsel had performed competently.

After a scrupulous review of the record, we conclude first that the evidence presented at trial, together with the petitioner's account of the interrogations, indicated that the petitioner was tired, that he had been drinking, that he wished to go home, and that he may have answered the officers' questions in order to secure his release. Given these indications, we hold that the government has failed to meet its heavy burden of proving that, if the jury had received Instruction 180 and if the petitioner's non-elicited testimony had been presented at trial,[11] the jury would have found the pretrial statements trustworthy beyond a reasonable doubt and thus could have considered these statements as evidence against the petitioner. We next consider whether, in the absence of these statements, the petitioner would have been found guilty of first-degree murder and first-degree sexual assault.

We find that the pretrial statements added very little to the overwhelming evidence of guilt with regard to the murder charge. Eyewitness testimony established that the petitioner and the victim were alone in the park on the morning of August 13, 1979; the petitioner testified at trial that he struck the victim repeatedly; physical evidence showed signs of a struggle and the victim's blood on the petitioner's clothes; marks on the victim's body revealed that she had been dragged into the river; there

discussed the case with the defense counsel and that he was in court as an observer during parts of the trial. According to the associate, "[the defense counsel] explained to me his theory of defense and we specifically discussed what areas he felt should be covered on direct examination which was simply that the victim was unharmed when last seen alive by Mr. Arrowood." Pet. Appendix at 208.

**10.** According to Officer Daly, the petitioner was "highly emotional" and "crying" when the police

officers arrived at his house at 4:45 a.m. Trial Tr. at 331. In addition, Detective Cooper, who remained with the petitioner throughout the morning, testified that the petitioner "appeared to have had an emotional experience." *Id.* at 537.

**11.** For purposes of our analysis of prejudice, we assume that the jury would have believed the petitioner's testimony. *See United States ex rel. Cosey v. Wolff,* 727 F.2d 656, 659 (7th Cir.1984).

was no indication that a third person came upon the victim in the wooded area of the park and drowned her. This review of the evidence clearly shows, beyond a reasonable doubt, that even if the defense counsel had performed competently and the jury had not considered the pretrial statements, pursuant to Instruction 180, the petitioner would have been found guilty of first-degree murder.

With regard to the charge of sexual assault, however, the petitioner's third pretrial statement was critical. In this statement, the petitioner admitted that he had sexual intercourse with the victim, who had tried to flee. At trial, the petitioner denied having intercourse and denied making the admission. Our careful review of the trial transcript also reveals that the physical evidence of sexual assault was less than overwhelming.[12] Indeed, in refusing to dismiss the charge of sexual assault, the trial judge relied heavily upon the third pretrial statement, and the Wisconsin Court of Appeals relied upon this statement in finding sufficient evidence to uphold the sexual assault conviction. We thus are not persuaded that the government has sustained its burden of proving beyond a reasonable doubt that the petitioner would have been found guilty of first-degree sexual assault if his counsel had performed competently and the jury had not considered the pretrial statements.

Accordingly, we hold that although the defense counsel performed adequately in all other aspects of this difficult case, his negligent failure to request Instruction 180 and his failure to elicit critical testimony from his client, taken together, may have had a serious prejudicial effect with regard to the sexual assault charge. We therefore reverse the district court's denial of the writ of habeas corpus on the charge of first-degree sexual assault, and we affirm the denial of the writ on the charge of first-degree murder.

---

12. The pathologist who examined the victim's body testified at trial that he "found no evidence that the victim had been raped." Trial Tr. at 411. In addition, the state's medical technician testified that her examination of a vaginal swab taken from the victim's body revealed no evidence of seminal material. Furthermore, although one sperm head was found by examining a rectal swab, the medical technician testified that she could not determine the presence of intact spermatozoa, and thus she could not positively identify semen on the victim's body. The technician stated that the rectal swab revealed "an elevated acid phosphatase activity," and that acid phosphatase is an enzyme that is present in high quantities of seminal material. However, she also explained that this enzyme is present in lesser quantities of other body fluids.

In addition, the medical technician testified that she found a stain of semen on the petitioner's jockey shorts, but that although this semen indicated the petitioner's blood type (the petitioner was a "secretor"), she was unable to determine whether the acid phosphatase found in the rectal swab derived from semen of this blood type.

We realize that, in Wisconsin, first-degree sexual assault requires only non-consensual sexual contact and does not necessarily require sexual intercourse. See Wis.Stat.Ann. § 940.225(1)(a) (West 1982). Yet, we find a notable lack of evidence regarding sexual contact. The pathologist made no mention of marks of sexual contact on the victim's body, and the medical technician acknowledged that pubic hair samples taken from the victim and from the petitioner were never examined.