**UNITED STATES of America, ex rel. Glenn PATTON, Petitioner-Appellant,**

**v.**

**James THIERET, Warden, Menard Correctional Center, Respondent-Appellee.**

**No. 85–1972.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 3, 1985.

Decided May 23, 1986.

Alfred L. Levinson, Palatine, Ill., for petitioner-appellant.

James V. Cinotto, Asst. Atty. Gen., Springfield, Ill., for respondent-appellee.

Before EASTERBROOK, Circuit Judge, ESCHBACH, Senior Circuit Judge, and GRANT, Senior District Judge.*

GRANT, Senior District Judge.

A state court jury found defendant-appellant, Glenn Patton, guilty of murder and armed robbery, for which he is now serving a sentence of thirty-five years and ten years respectively. The Illinois Appellate Court, Third District, affirmed the convic-

---

* Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

tion and sentence on appeal. *People v. Patton*, 90 Ill.App.3d 263, 45 Ill.Dec. 515, 412 N.E.2d 1097 (1980). In October 1981, Patton filed a petition for a writ of habeas corpus in the district court. Because federal substantive law had changed concerning warrantless arrests in a suspect's home, the district court in November 1982 dismissed the petition for failure to exhaust state remedies on that claim. *United States ex rel. Patton v. Greer*, No. 81–3359 (S.D.Ill. Nov. 3, 1982). Patton then filed a post-conviction petition which the state trial court denied. The Illinois Appellate Court affirmed the denial. *People v. Patton*, 122 Ill.App.3d 46, 77 Ill.Dec. 547, 460 N.E.2d 851 (1984). The Illinois Supreme Court denied his petition for leave to appeal. Patton then filed the instant petition for a writ of habeas corpus in the district court, which heard oral argument on the petition on October 22, 1984. The district court entered an order denying the petition on December 18, 1984, which Patton now appeals. We have jurisdiction pursuant to 28 U.S.C. § 1291. For the reasons stated below, we affirm.

## Facts

On June 4, 1979 at approximately 11:30 p.m., William Lininger went to his mailbox in his apartment complex at 308 Sterling in Peoria, Illinois. He saw a brown Camaro pull into the parking lot. A black male, walking from the area where the car had parked, passed Lininger and entered the building. Lininger proceeded to his car which was parked in the same lot. A short time later he saw two black men leave the building, and he recognized one of them as the man who had passed him by the mailbox. After he watched them reenter the building, Lininger heard a loud "pop," and saw them run out of the building. They stopped, and then walked across the parking lot. Lininger entered the building, where he found Gregory Sargent lying in the hallway, bleeding from a gunshot wound in the back of the neck.

When the police arrived, Sargent told one officer that two black men wearing nylon stockings on their heads had attacked him. Lininger told the police what he had seen and identified the brown Camaro which remained in the parking lot. A license number check showed that a Mary Jamison owned the car. Someone removed the car from the lot during the night. Sargent died as a result of the gunshot wound on June 8, 1979.

The police prepared a composite drawing of the man Lininger had seen. On June 7, 1979, an investigating officer received a confidential telephone call suggesting that he "check out" an individual named Willingham. The officer found a picture of Willingham in the police files which matched the composite. On June 9th, the police received two more calls suggesting that they "check out" Willingham regarding the murder. Through Willingham's cousin, Victor Blakes, the police learned that Willingham lived at the Gaslight Apartments with Mary Jamison and that he often used her brown Camaro.

On June 9th, Mary Jamison confirmed that Willingham lived with her, that she owned a brown Camaro, and that he had used that car on June 4th. She told the police that he owned a gun which he had taken with him on June 4th. She also said that she had seen a nylon stocking in her car between the driver's door and driver's seat on June 5th, which had not previously been there. Jamison voluntarily went to the police station, gave a written statement and consented to a search of her car, which produced a coffee-colored stocking with a knot in it and a pair of pants which appeared to be stained with blood. Jamison's written statement named "Glenn" as Willingham's best and most trusted friend, and stated that Glenn had left her apartment with Willingham approximately two hours before Sargent was shot. The police arrested Willingham at Jamison's apartment.

Meanwhile, in another conversation, Blakes told the police that Glenn Patton had taken Betty Balestri, Willingham's girl friend, and either Tracy Lorenz or Karyn Shay, Patton's girl friends, to Sargent's apartment prior to the shooting. When

Sargent had made advances to Balestri, she had asked Patton to take her home, which he did. The police then went to Patton's apartment where Karyn Shay told them that Patton had returned from school about 9:30 p.m. on the night of June 4th, and that they had watched a cowboy movie in bed until 12:30 a.m. Shay went voluntarily to the station, where she repeated her story.

At the station, the police read Willingham his rights. At first he denied being at the scene of the shooting, but when the police confronted him with some of the evidence, he gave a statement claiming that he went to Sargent's apartment to buy drugs. He stated that some individuals broke in and shot Sargent and that he then fled to Tracy Lorenz's apartment where he told his girl friend, Betty Balestri, what had happened.

Betty Balestri corroborated Willingham's story the same day, but the next evening, June 10th, she said that Willingham had told her at approximately 12:45 a.m. on June 5th that he and a David Thomas had gone to Sargent's to steal cocaine and that a struggle had ensued in which Sargent was shot. In a panic, Willingham and Thomas fled to Tracy Lorenz' apartment. They asked the two women to go back later and get the car. Balestri said that Glenn Patton was at Lorenz' apartment at that time, and that Willingham planned to tell him what had happened. She also stated that both Patton and Lorenz later told her that Willingham had told them that he was involved in the shooting. Finally, she stated that Patton was at the Lorenz house for approximately an hour on June 4th, that he left for approximately a half hour, and that he returned approximately fifteen minutes before Willingham arrived.

After receiving Balestri's new statement, the police went to Patton's apartment without a warrant and knocked on the door. When Patton opened the door, they told him that they wanted to question him at the station. Patton asked if he had to go, and one of the officers said yes. Patton said that he didn't want to go unless arrested. The officers arrested him, took him to the station, and put him in an interview room. Meanwhile, Willingham told the police that he, Patton and Thomas had planned to rob Sargent, and that the scuffle and shooting had followed. At 11:00 p.m., the police again formally arrested Patton for murder, searched him and read him his rights. Patton then indicated that he wanted to talk. After being detained in a holding cell for approximately forty minutes, he gave an oral admission and agreed to give a written statement on condition that the state's attorney knew that he was cooperating with the police. The assistant state's attorney, after determining that the police had made no promises to Patton, asked Patton if he had been apprised of his rights. The assistant state's attorney acknowledged that he knew that Patton was cooperating, but asked him if he understood that he was not promising him leniency. Patton replied, "I understand that," and, after the state's attorney left, Patton gave a written statement which he later tried to suppress.

The court denied Patton's motions to quash his arrest, suppress evidence and suppress his statements. It found that probable cause for the arrest existed and that Patton confessed voluntarily after having been advised of his *Miranda* rights.

During the rebuttal argument, at trial, the prosecutor told the jury that they need not determine whether the police had complied with *Miranda*. Patton made no objection to this. The jury found him guilty of murder and armed robbery.

Patton raises three issues on appeal:

I. Whether the district court erred in determining that Patton was not entitled to federal habeas relief on his fourth amendment claim;

II. Whether the district court erred in determining that he was not entitled to federal habeas relief on his fifth amendment claims; and,

III. Whether the district court erred in determining that the prosecutor's remarks during rebuttal did not render his trial fundamentally unfair.

## I. Whether the district court erred in determining that Patton was not entitled to federal habeas relief on his fourth amendment claim.

■ Patton presented his fourth amendment claim first at the trial court hearing on his Motion to Quash Arrest and Suppress Evidence, then on direct appeal to the Illinois Appellate Court, and finally on appeal of his post-conviction petition to the Illinois Appellate Court. Each court reached the same conclusion: probable cause existed for Patton's warrantless arrest. The district court relied upon *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), in which the Supreme Court held: "[W]here the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 482, 96 S.Ct. at 3046.

Patton argues that the Illinois state courts afforded him a full, but not a fair opportunity to litigate his fourth amendment claim of arrest without probable cause. This Court has addressed the fairness issue in *Arrowood v. Clusen,* 732 F.2d 1364, 1368 (7th Cir.1984). "A federal habeas corpus petitioner has 'fairly presented' a claim to a state court if he has clearly informed the state court of the factual basis of that claim and has argued to the state court that those facts constituted a violation of the petitioner's constitutional rights." *Id.* Patton raised and argued this issue at each stage of his state court proceedings. The fact that he disagrees with the outcome of those litigations does not remove *Stone's* bar to federal habeas relief. *United States ex rel. Maxey v. Morris,* 591 F.2d 386, 389 (7th Cir.), *cert. denied,* 442 U.S. 912, 99 S.Ct. 2828, 61 L.Ed.2d 278 (1979). The district court correctly concluded that *Stone v. Powell* bars review of Patton's fourth amendment claim.

## II. Whether the district court erred in determining that Patton was not entitled to federal habeas relief on his fifth amendment claim.

■ Patton contends that the police violated his fifth amendment rights when they literally "read" him the *Miranda* warnings from a printed card. He reasons that this behavior created an "aura of officiality" which coerced him to waive his *Miranda* rights and confess. We will not overturn the district court's finding of fact regarding the waiver of *Miranda* rights unless it is clearly erroneous. *Gorham v. Franzen,* 760 F.2d 786, 790 (7th Cir.) (citations omitted), *cert. denied,* —— U.S. ——, 106 S.Ct. 255, 88 L.Ed.2d 262 (1985); Fed.R.Civ.P. 52(a).

The *Miranda* warnings provide a procedural safeguard to protect a suspect's privilege against self-incrimination during custodial interrogation. *Miranda v. Arizona,* 384 U.S. 436, 477, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The police conduct which Patton attacks epitomizes what the Supreme Court has recently characterized as a "careful administration of *Miranda* warnings," *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 1296 n. 4, 84 L.Ed.2d 222 (1985), which does not constitute coercion. *Id.* at 1292 n. 1. Therefore, Patton's claim has no merit.

■ Patton also argues that the police violated his fifth amendment rights because they did not repeat the *Miranda* warnings before he gave an oral statement. To be clearly erroneous, the district court's finding must be implausible "in light of the record viewed in its entirety." *Gorham v. Franzen,* 760 F.2d at 790 (citations omitted). The record indicates that the police formally arrested Patton at 11:00 p.m. They read him his rights, searched him, and placed him in a holding cell for about forty minutes. Patton then gave an oral statement and agreed to give a written statement after speaking with the state's attorney. The lapse of time between ad-

---

ministration of the *Miranda* warnings and the suspect's statement is one of the factors to consider in determining the validity of a waiver of *Miranda* rights. The passage of forty minutes does not require that the *Miranda* warnings be given again. *See United States ex rel. Henne v. Fike*, 563 F.2d 809, 814 (7th Cir.1977) (nine hours between warnings and waiver not too long), *cert. denied*, 434 U.S. 1072, 98 S.Ct. 1257, 55 L.Ed.2d 776 (1978); *see also Stumes v. Solem*, 752 F.2d 317, 320 (8th Cir.) (five hours between warnings and waiver not too long), *cert. denied*, —— U.S. ——, 105 S.Ct. 2145, 85 L.Ed.2d 502 (1985). The brief lapse of time between Patton's apprisal of his rights and his oral admission, and his affirmative action in seeking to make a deal with the state's attorney, indicate his knowing and voluntary waiver of his rights. The district court correctly determined that he was not entitled to federal habeas relief on his fifth amendment claim.

*III. Whether the district court erred in determining that the prosecutor's remarks during rebuttal did not render his trial fundamentally unfair.*

During the course of his rebuttal argument, the prosecutor made the following statement regarding the voluntariness of Patton's oral and written admissions: "And Miranda was complied with. And you are not even to consider that. That is not your job to determine whether Miranda was complied with. You won't be instructed on that." Record at C–1340. Patton argues that this statement constituted prosecutorial misconduct, because it implied that the court had already made up its mind on the issue of coercion in the defendant's favor. Such an implication, he reasons, would prejudice the jury against Patton and therefore deny him a fair trial.

In evaluating claims of prosecutorial misconduct, we examine the conduct in the context of the trial as a whole, to determine if such conduct was "so inflammatory and prejudicial to the defendant ... as to deprive him of a fair trial." *United States v. Howard*, 774 F.2d 838, 848 (7th Cir.1985) (citations omitted). We have also consistently recognized the importance of determining whether the particular comment was invited by defense counsel. *Id.* at 849 (citations omitted). In this case, the prosecutor's remarks followed defense counsel's argument attacking the manner in which the *Miranda* warnings were given and implying coercion. Record at C–1328, C–1329. The prosecutor's remarks were invited comment. Further, the court mitigated any possible harm when it instructed the jury that it was their responsibility to determine what weight to give to Patton's statement, and that they should consider all of the circumstances under which he made the statement. Record at C–228. We conclude that the district court correctly determined that the prosecutor's remarks during rebuttal did not render Patton's trial fundamentally unfair.

### Conclusion

For these reasons, we AFFIRM the decision of the district court.